**MONTANA POWER CO. v. FEDERAL POWER COMMISSION.**

No. 10200.

United States Court of Appeals
District of Columbia Circuit.

Argued March 20, 1950.

Decided Oct. 4, 1950.

Messrs. S. B. Chase, Jr., Great Falls, Mont., John C. Hauck and R. H. Glover, Butte, Mont., all of the Bar of the Supreme Court of Montana, pro hac vice, by special leave of Court with whom Messrs. Herbert M. Bingham and H. Donald Kistler, Washington, D. C., were on the brief, for petitioner.

Messrs. Bradford Ross, General Counsel, Federal Power Commission, and Willard W. Gatchell, Assistant General Counsel, Federal Power Commission, Washington, D. C., with whom Messrs. Louis W. McKernan and William J. Costello, Attorneys, Federal Power Commission, Washington, D.C., were on the brief, for respondent.

Before WILBUR K. MILLER, BAZELON and FAHY, Circuit Judges.

BAZELON, Circuit Judge.

Petitioner seeks review of an order of the Federal Power Commission, issued pursuant to § 4(g) of the Federal Power Act,[1] requiring that it apply for licenses for its nine hydroelectric developments, all located in Montana. The Commission asserts authority for its action under § 23(b) of the Act.[2] That section provides that no hydroelectric development may be constructed, operated, or maintained on "* * navigable waters of the United States, or upon any part of the public lands or reservations of the United States * * * except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this chapter."

The Commission found that, of petitioner's nine developments, four (Morony, Ryan, Rainbow and Black Eagle) are maintained on "navigable waters of the United States" without authority; two (Hauser and Canyon Ferry) are also located on "navigable waters" and are maintained under an invalid authorization to occupy public lands; one (Holter) is maintained under a valid authority to occupy public lands but such authority does not extend to occupancy of the "navigable waters" on which it is located; the remaining two (Madison and Hebgen) are on concededly non-navigable waters but occupy public lands without authority.[3]

I

Since all but the Madison and Hebgen developments are located on the Missouri River upstream from Fort Benton, the first question to be answered is whether or not the section of the river from Fort Benton to the headwaters at Three Forks is a "navigable water of the United States." This part of the river is about 263 miles in length, all within Montana, the rest of the river flowing through several states. About 32 miles above Fort Benton are the Great Falls of the Missouri, a series of rapids and falls which descend about 520 feet in 17 miles, and which have always presented a natural barrier to through navigation.

There is no dispute that the river from its mouth at St. Louis, Missouri, to Fort Benton, Montana, has been used by steamboats in the past.[4] And, though the Great Falls themselves have never been navigated, the Commission had before it substantial evidence of actual use of the river upstream from Fort Benton to the foot of

1. § 4(g), 16 U.S.C.A. § 797(g), provides that the Commission is empowered "Upon its own motion to order an investigation of any occupancy of, or evidenced intention to occupy, for the purpose of developing electric power, public lands, reservations, or streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States by any person, corporation, State, or municipality and to issue such order as it may find appropriate, expedient, and in the public interest to conserve and utilize the navigation and water-power resources of the region."

2. 16 U.S.C.A. § 817.

3. Petitioner has already applied for a license for its Madison development.

4. See discussion of the effect of the Fort Peck dam, infra, p. 4. [185 F.2d 495.]

the falls, and from above the falls to Three Forks. Thus, the record reveals that in 1866-67, several steamboats sailed as far as thirty miles above Fort Benton, almost up to the falls. And the river above the falls was used for the transportation of logs and rafts of lumber as well as for local carriage of freight and passengers. The only reported use of the entire length of the upper river for through traffic from above the falls to Fort Benton below occurred from 1864 to 1870. During that period, gold miners in considerable number traveled downstream with the aid of a portage or "land carriage" around the falls.[5] Such actual use of the river in the past brings it within the "navigable" category, even if subsequently discontinued. "When once found to be navigable, a waterway remains so."[6]

▉▉ Actual use of the upper portion of the river would warrant its being termed a "navigable water" unless such status is denied it because a part thereof is a non-navigable stretch of falls. We agree with the Commission that the falls do not have such an effect. Section 3(8) of the Federal Power Act[7] states the applicable criteria, as follows: " 'navigable waters' means those parts of streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, and which either in their natural or improved condition notwithstanding interruptions between the navigable parts of such streams or waters by falls, shallows, or rapids compelling land carriage, are used or suitable for use for the transportation of persons or property in interstate or foreign commerce, including therein all such interrupting falls, shallows, or rapids, together with such oth-

er parts of streams as shall have been authorized by Congress for improvement by the United States or shall have been recommended to Congress for such improvement after investigation under its authority".

The statute specifically contemplates that the "navigable parts" of streams may be interrupted by falls, rapids, and shallows "compelling land carriage" to circumvent them. Such interruptions do not render an otherwise navigable stream non-navigable. This was recognized by the Supreme Court in Economy Light & Power Co. v. United States, 1921, 256 U.S. 113, 122, 41 S.Ct. 409, 412, 65 L.Ed. 847, where it was said that "Navigability, in the sense of the law, is not destroyed because the watercourse is interrupted by occasional natural obstructions or portages". And more recently, in United States v. Appalachian Electric Power Co., 1940, 311 U.S. 377, 408-409, 61 S.Ct. 291, 300, 85 L.Ed. 243, the Court reaffirmed its view that "the navigability referrde to in the cases was navigability despite the obstruction of falls, rapids, sand bars, carries or shifting currents."[8]

Although we think the historical uses to which the upper portion of the river was put suffice to make it "navigable" within § 3(8), it should be noted that the Act's definition is not confined to streams which are or can be used in their natural condition. It includes as well those streams which are "suitable for use" in interstate commerce. "A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken * * *. Nor is it necessary that the improvements should be actually completed

---

5. In 1872, an engineer for the Northern Pacific Railroad proposed that the entire length of the river be used for transportation, with provision to be made for shipping freight around the falls by rail. His report was ultimately published under the auspices of the War Department.

6. United States v. Appalachian Electric Power Co., 1940, 311 U.S. 377, 408, 61 S.Ct. 291, 299, 85 L.Ed. 243; Economy

Light & Power Co. v. United States, 1921, 256 U.S. 113, 123–124, 41 S.Ct. 409, 65 L.Ed. 847.

7. 16 U.S.C.A. § 796(8).

8. See also The Montello, 1874, 20 Wall. 430, 87 U.S. 430, 442–443, 22 L.Ed. 391; St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners, 1897, 168 U.S. 349, 359, 18 S.Ct. 157, 42 L.Ed. 497.

or even authorized. The power of Congress over commerce is not to be hampered because of the necessity for reasonable improvements to make an interstate waterway available for traffic."[9]  Of course, improvements which might be reasonable in an urban industrial area might be out of the question in a sparsely settled region. But we do not think that factors of economic geography, such as density of population and concentration of industry, may remove an otherwise navigable stream from the reach of federal power. If the stream's flow, depth, gradient, width and capacity make it "suitable for use" in interstate commerce, it is subject to the licensing authority of the Federal Power Commission. Even if such a stream is never actually used for transportation, there is no doubt that it may be necessary to use it for flood control, watershed development, regulation of the navigable capacity of the portions of the river actually used for transportation, etc.[10]  We have been shown nothing which convinces us that the Commission's determination on this point was improper.

An additional criterion of navigability is established by § 3(8).[11]  If Congress has authorized improvements to facilitate navigation, after investigation of its authority to do so, or if such improvements have been recommended to it, then the sections of the streams thus dealt with are "navigable waters."  There is uncontroverted evidence in the record that, at various times from 1868 to 1892, the upper river was investigated by the Army Engineers with a view to its improvement. In 1880, about $15,000 was spent for rock removal and

construction, and from 1895 to 1899 about $66,000.

Under all three tests laid down by § 3(8), the 263 mile stretch of the Missouri River from Fort Benton to Three Forks is a "navigable water of the United States," and hence subject to the licensing requirements of the Federal Power Act. We do not think that the construction of the Fort Peck dam below Fort Benton, which has virtually eliminated actual use of the upper portion of the river for transportation, can alter such status. Until 1887, the river above Fort Peck was part of an interstate highway used extensively by steamboats traveling between Fort Benton and St. Louis. Although railway competition ultimately eliminated it as a substantial artery of commerce, such decrease in use does not transform a navigable river into a non-navigable one. "Commercial disuse resulting from changed geographical conditions, and a Congressional failure to deal with them, does not amount to an abandonment of a navigable river or prohibit future exertion of federal control."[12]  Nor do we think that the view of a subordinate official of the Army Engineers, expressed in a report to Congress, that the erection of the Fort Peck dam below Fort Benton would make the river non-navigable beyond the dam, can give rise to Congressional abandonment of the waters in question. Abandonment of sovereign authority should not be lightly inferred from the actions of subordinate officers in the Executive Department,[13] especially when it appears that other officers have subsequently made statements to the contrary.[14]  Absent clear indication of

9. 311 U.S. at page 407, 408, 61 S.Ct. at page 299.

10. Cf. Id., 311 U.S. at page 426, 61 S.Ct. 308.

11. Quoted supra p. 3. [185 F.2d 494.]

12. State of Arizona v. California, 1931, 283 U.S. 423, 453–454, 51 S.Ct. 522, 525, 75 L.Ed. 1154. See note 6 supra.

13. Wheeling & Belmont Bridge Co. **v.** Wheeling Bridge Co., 1891, 138 U.S. 287, 292–293, 11 S.Ct. 301, 34 L.Ed. 967; see Economy Light & Power Co. v. Unit-

ed States, 256 U.S. at page 124, 41 S.Ct. 409, 65 L.Ed. 847.

14. In a letter dated December 5, 1946, and addressed to the Chairman of the Federal Power Commission, the Chief of Engineers of the U. S. Army wrote: "The construction of Fort Peck Dam does not affect the jurisdiction of this Department with respect to the navigable status of the Missouri River above that dam. This office does not now, nor has it ever in the past, taken the position that the construction of the Fort Peck Dam, or any other Missouri River dam, has had the

abandonment, there appears to be ample authority for the proposition that a stream remains navigable even after construction of a barrier or impassable dam below.[15]

## II

We agree with the Commission that the river upstream from Fort Benton is a "navigable water," and therefore affirm its order requiring that petitioner apply for licenses for the Morony, Ryan, Rainbow and Black Eagle dams. Petitioner contends, however, that its three other dams (Holter, Hauser and Canyon Ferry), which are located on this same navigable stream, need not be licensed because they occupy public lands "* * * under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920 * * *."[16]

Similarly, the Hebgen development, which is concededly not on a "navigable water," is said to be maintained under a valid authorization to occupy public lands.

■ *Holter.* Petitioner occupies the public lands on which its Holter development is located under a permit issued directly to it by the Secretaries of Interior and Agriculture in April, 1920, just before enactment of the Federal Water Power Act which preceded the Federal Power Act. The Commission does not contest the validity of the land permit, as such, but instead insists that it does not and could not authorize occupancy of navigable waters. We agree. At the time the permit was issued, there could be no obstruction of navigable waters without a license from the Secretary of War under the River and Harbor Act of 1899.[17] Land permit statutes enacted subsequent to 1899, under which petitioner now asserts authority for Holter, merely supplemented the 1899 Act and did not remove the separate license requirement contained therein. Thus, a general grant of authority to the Secretary of the Interior to build reservoirs in aid of reclamation did not carry with it consent to obstruct navigable waters. Additonal authorization therefor from the Secretary of War was held to be necessary.[18] Since the permit under which petitioner claims contains no such authorization, its operation of the Holter development is unlawful under § 23(b) and the Commission may require that application for a license be made.

■ *Hauser.* Authority to occupy the land upon which the Hauser dam is located is said to stem from the issuance of a permit to the Helena Power Transmission Company by the Secretaries of Interior and Agriculture in 1907. Petitioner acquired these permits after a series of foreclosures and mergers. The Commission found that no valid transfer of these permits to petitioner was ever made or approved by the proper authorities. It points to the fact that the Agriculture permit issued to the Helena Company specifically stated that "it shall not be transferable"; although the Interior permit did not itself contain such language, the regulations applicable thereto provided that "a final permit may be transferred to a new permittee under the following conditions and not otherwise * * *." Petitioner does not challenge the validity of these regulations. Nor does it argue that a new permit was requested from the Department of Agriculture to replace the non-transferable permit held by its predecessor. In like fashion, the Interior permit is ineffective since it does not appear to have been transferred as required by applicable regulations.

■ Petitioner would avoid the effect of its non-compliance with these transfer provisions by breaking through the various corporate shells which separate it from the Helena Company and by showing that the

---

effect of bringing the head of navigability down-stream to a point below the dam in question."

15. See cases cited in notes 6 and 12 infra. See also Pennsylvania Water & Power Co. v. Federal Power Commission, 1941, 74 App.D.C. 351, 123 F.2d 155, 161, cer-

tiorari denied, 1942, 315 U.S. 806, 62 S. Ct. 640, 86 L.Ed. 1205.

16. 16 U.S.C.A. § 817.

17. 33 U.S.C.A. §§ 403, 406.

18. United States v. Arizona, 1935, 295 U. S. 174, 191, 55 S.Ct. 666, 79 L.Ed. 1371.

two companies are substantially identical. We do not think, however, that the corporate form can be cast off whenever it suits the convenience of those using it.[19] When a merger or consolidation takes place, it always involves the transfer of properties either from corporation A to the corporation into which it is merged or from corporations A and B to a third new corporation.[20] Such a transfer undeniably took place here but not in conformity with governing regulations.

■ Nor do we think that a nonassignable permit to a predecessor in interest is made assignable by petitioner's payment of rentals thereon through the years. Acceptance of such rentals by subordinate officials of the departments involved cannot estop the Government from asserting its title to the land and bar it from requiring that petitioner conform with applicable statutes and regulations. The Government is too vast, its operations too varied and intricate, to put it to the risk of losing that which it holds for the nation as a whole because of the oversight of subordinate officials.[21]

*Canyon Ferry.* The problem here is the converse of that in Holter. Occupancy of the stream on which the dam is located was authorized under the River and Harbor Act of 1896, but, according to the Commission, there was no authorization to occupy the public lands on which the dam was built. But we need not reach that issue. As is the case with the Hauser dam, the permit under which petitioner claims is in the name of a predecessor in interest, the Missouri River Electric and Power Company, and was never properly transferred to petitioner.

Since a sale of the Canyon Ferry development to the United States Government took place after the Commission's order was made, the petitioner urges that this part of the case is moot. We do not decide that question for we think the Commission should be given the opportunity to reconsider the matter in the light of the changed circumstances and we therefore remand this phase of the case for that purpose.

*Hebgen.* Petitioner acquired the land permit, said to justify Hebgen's occupancy of public lands, from the Montana Reservoir and Irrigation Company in 1934. Such transfer was neither made nor approved as required by provisions contained in the permit. The situation here is much the same as that with regard to Hauser and Canyon Ferry, and a license may be required for like reasons.

III

■ Petitioner makes several procedural objections to the Commission's conduct of the proceeding below. (1) It is said that the Commission's order is void because petitioner was not given notice that certain issues (occupancy of public lands and effect of the waters above Fort Benton upon the navigable capacity of the river below Fort Benton) were in the case until the day the evidence regarding such issues was offered. Since petitioner introduced evidence on these issues, had adequate opportunity to obtain whatever continuances were necessary, and asserts no prejudice attributable to the allegedly defective notice, we hold his contention without merit.[22] (2) Petitioner insists that newspaper accounts and histories describing the use made of the river during the 19th century are hearsay and hence should not have been admitted or relied upon by the Commission. Section 308(b)[23] of the

19. Traditionally, the corporate form is ignored only at the suit of (1) one victimized by use of the corporation to perpetrate fraud or illegality, or (2) to work out conflicting claims against and equities in the corporation itself. See 1 Fletcher, Corporations, § 41 et seq. (1938).

20. See 15 id. § 7041.

21. United States v. California, 1947, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 91 L.Ed. 1889; United States v. City and County of San Francisco, 1940, 310 U.S. 16, 31–32, 60 S.Ct. 749, 84 L.Ed. 1050.

22. See Kuhn v. Civil Aeronautics Board, 87 U.S.App.D.C. ——, 183 F.2d 839, and authorities cited therein.

23. 16 U.S.C.A. § 825g(b).

Federal Power Act specifically provides that "the technical rules of evidence need not be applied" in hearings under the Act. Such a provision is intended "to free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order." [24] It has long been recognized that, though hearsay evidence lacks certain guarantees of trustworthiness such as amenability to cross-examination, it may yet be relevant and have probative value. Where it is the best available evidence, as where the subject matter is beyond the recall of living witnesses, hearsay may be admitted even in judicial proceedings. Thus, it is settled that historical works generally considered authentic are admissible in evidence, especially in cases such as this one which must delve into the relatively ancient and obscure origins of commerce on the nation's rivers.[25] And the same is true of newspaper accounts, which are among the source materials of history. At any rate, we do not think the hearsay rule is applicable to administrative proceedings so long as the evidence upon which an order is ultimately based is both substantial and has probative value. "The requirement that the administrative findings accord with the substantial evidence does not forbid administrative utilization of probative hearsay in making such findings." [26] (3) Petitioner says that the order is void because the Secretaries of Interior and Agriculture were indispensable parties and were not joined. It is true that those officers had some interest in the subject matter of the proceeding, especially as regards the land permits involved. But it seems clear to us that the Commission was vested with jurisdiction over the subject matter involved and adequately represented the United States Government therein. The Secretaries were at most proper parties. Their failure to participate does not invalidate the order.

Affirmed in part and remanded in part in accordance with this opinion.

WILBUR K. MILLER, Circuit Judge, dissents.

24. Consolidated Edison Co. of New York v. National Labor Relations Board, 1938, 305 U.S. 197, 229–230, 59 S.Ct. 206, 217, 83 L.Ed. 126.

25. 5 Wigmore §§ 1597–1598 (1940). It is noteworthy that the Supreme Court considered historical materials in the leading case of The Montello, supra note 8, 20 Wall. 430, 87 U.S. at page 442, 22 L.Ed. 391. See also Arizona v. California, 1931, 283 U.S. 423, 453 note 3, 51 S.Ct. 522, 525, 75 L.Ed. 1154.

26. Willapoint Oysters, Inc., v. Ewing, 9 Cir., 1949, 174 F.2d 676, 690, certiorari denied, 1949, 338 U.S. 860, 70 S.Ct. 101.