**CARTER–WALLACE, INC., Petitioner,**

v.

**John W. GARDNER, Secretary of Health, Education, and Welfare, and James L. Goddard, Commissioner of Food and Drugs, Respondents.**

No. 12200.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 31, 1968.
Decided Nov. 4, 1969.

Stephen R. Lang, Alexandria, Va. (William L. Hanaway, Breed, Abbott & Morgan, New York City, Ralph H. Ferrell, Jr., and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on brief), for petitioner.

William W. Goodrich, Asst. Gen. Counsel, Dept. of Health, Education, and Welfare (Joanne S. Sisk and Eugene M. Pfeifer, Attys., Dept. of Health, Education, and Welfare, and Fred M. Vinson, Jr., Asst. Atty. Gen., and William E. Ryan, Atty., Dept. of Justice, on brief), for respondents.

Before HAYNSWORTH, Chief Judge, BUTZNER, Circuit Judge, and HUTCHESON, Senior District Judge.*

BUTZNER, Circuit Judge:

The Commissioner of Food and Drugs subjected meprobamate and compounds containing meprobamate in combination with other drugs to special controls under the Federal Food, Drug & Cosmetic Act.[1] Carter-Wallace, Inc., a manufacturer and distributor of the drug, petitioned for review under the statutory proceedings authorized by the Act and the general provisions of the Administrative Procedure Act.[2] We affirm the Commissioner's order because we believe that his decision is supported by substantial evidence and that it is warranted by law.

---

* Judge Hutcheson participated in the hearing and the decision of this case, but he died before the opinion was completed.

1. 21 U.S.C. § 301 et seq.

2. 21 U.S.C. §§ 321(v), 371(f), and 5 U.S.C. §§ 702, 704, and 706.

## I.

In 1965, Congress amended the Federal Food, Drug & Cosmetic Act to provide control over barbiturates, amphetamines, and other drugs having a similar effect on the central nervous system.[3] These drugs were classified as "depressant or stimulant drugs." Control over them is accomplished through increased record keeping and inspection requirements, regulation of intrastate traffic, and by making possession of the drugs, other than by the user, illegal outside of the legitimate channels of commerce. A prescription for a depressant or stimulant drug may not be filled more than six months after the date on which it was issued and it may not be refilled more than five times unless renewed by the prescribing physician.[4]

The genesis of these proceedings is § 201(v) of the amendments [21 U.S.C. § 321(v)], which provides in part:

"The term 'depressant or stimulant drug' means—

"(1) any drug which contains any quantity of (A) barbituric acid * *;

"(2) any drug which contains any quantity of (A) amphetamine * *;

"(3) any drug which contains any quantity of a substance which the Secretary, after investigation, has found to have, and by regulation designates as having, a potential for abuse because of its depressant or stimulant effect on the central nervous system * * *."

The legislative history of this section clearly reflects the concern with which Congress viewed meprobamate. The House Committee Report states:[5]

"The committee considered the advisability of specifically designating meprobamate [and five other drugs]

as 'depressant or stimulant drugs.' It was decided that this should not be done because the Secretary of Health, Education, and Welfare will, under the provisions of proposed section 201(v) (3) of the Federal Food, Drug, and Cosmetic Act, consider designating these drugs as 'depressant or stimulant drugs' and that it would be inadvisable to single out these drugs while leaving out others having substantially similar abuse potentials. The committee expects the Secretary to take early action with respect to the consideration of the listing of these six drugs."

■■ Against this background, the Food and Drug Administration conducted extensive hearings that culminated in subjecting meprobamate to control as a depressant drug. In canvassing the record upon review, we are required to give conclusive effect to the Commissioner's findings of fact that are supported by substantial evidence. 21 U.S.C. § 371 (f).[6]

Meprobamate is one of a group of drugs known as minor tranquilizers which are used for the symptomatic relief of anxiety and tension associated with psychoneurotic disorders. It was first used in clinical trials in 1952, and it has been widely distributed commercially since 1955 in tablets or capsules of 200 and 400 milligram doses. Carter-Wallace has produced enough of the drug to make approximately 14 billion tablets. It may be dispensed only by prescription, and an estimated 500 million prescriptions have been written. The maximum recommended adult dosage is 2,400 milligrams daily. Meprobamate is a safe, effective drug when it is taken in accordance with the manufacturer's recommendation under a physician's direction.

---

3. H.R.Rep. No. 130, 89th Cong., 1st Sess. 1 (1965) U.S.Code Cong. and Admin. News, p. 1895.

4. 21 U.S.C. § 360a; H.R.Rep. No. 130, 89th Cong., 1st Sess. 1, 3 (1965).

5. H.R.Rep. No. 130, 89th Cong., 1st Sess. 13 (1965).

6. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

In order to subject meprobamate to the Act's special controls the Commissioner must find, first, that it has a depressant effect on the central nervous system; second, that it has a potential for abuse; and, third, that this potential results from its depressant effect on the central nervous system.

There can be no doubt about the sufficiency of the proof of the first element. The regulations [21 C.F.R. § 166.2] provide that a drug has a depressant effect on the central nervous system if there is substantial evidence that the drug may produce (a) a calming effect or relief of emotional tension or anxiety; or (b) drowsiness, sedation, sleep, stupor, coma, or general anesthesia; or (c) mood depression or apathy. Nearly all of the medical witnesses testified that the major therapeutic effects of meprobamate are to calm the patient and to give relief from emotional tension or anxiety. A number of witnesses established that large dosages of meprobamate cause stupor and induce apathy. The precise way in which meprobamate achieves these effects is not known with certainty, but the undisputed evidence establishes that it acts upon the central nervous system.

In selecting "potential for abuse" as one of the criteria for subjecting a drug to special control, the House Committee did not intend this to be determined on the basis of the drug's having only a potential for isolated or occasional nontherapeutic purposes. Instead, the committee recommended that a drug's potential for abuse should be determined "on the basis of its having been demonstrated to have such depressant or stimulant effect on the central nervous system as to make it reasonable to assume that there is a substantial potential for the occurrence of significant diversions from legitimate drug channels, significant use by individuals contrary to professional advice, or substantial capability of creating hazards to the health of the user or the safety of the community." [7]

The evidence on this issue is in sharp conflict. It ranges from testimony of Carter-Wallace's experts that the potential for abuse of candy or aspirin is greater than for meprobamate to testimony from a government witness that he became so uneasy about alcoholics' affinity for the drug he stopped prescribing it for them. A number of well-qualified medical witnesses called by Carter-Wallace testified that while treating patients with meprobamate over a period of years they had observed no evidence of the drug's abuse, or at the most they had seen only isolated or occasional cases.

Doctors testifying for the government presented a different picture. They told of patients who used meprobamate to the extent that they became intoxicated —with staggering gait, slurred speech, and impaired coordination. Testimony also disclosed that some persons who took excessive doses of meprobamate felt "high" or experienced euphoria. Credible evidence established that continuous

7. H.R.Rep. No. 130, 89th Cong., 1st Sess. 7 (1965). The source of the committee's definition is The President's Advisory Commission on Narcotic and Drug Abuse, Final Report, p. 2 (1963), which states:
"When this report speaks of 'drug addiction' it is using the term in its full technical sense to include both the psychological and the physical dependence. When it speaks of 'drug abuse' it is referring to the broader problem which includes also those drugs which create only psychological dependency. We will use the term 'drug abuse' in this report as existing when an individual takes psychotoxic drugs under any of the following circumstances:

"(a) in amounts sufficient to create a hazard to this own health or to the safety of the community; or
"(b) when he obtains drugs through illicit channels; or
"(c) when he takes drugs on his own initiative rather than on the basis of professional advice.
"Drug abuse today involves not only the narcotic drugs and marihuana, but to an increasingly alarming extent other drugs such as the barbiturates, the amphetamines and even certain of the 'tranquilizers'. This latter group will be referred to in this report as the 'dangerous drugs'."

use of the drug produces tolerance to its effects. This, in turn, requires more of the drug to achieve the original effect. Excessive use of meprobamate creates physical dependence upon the drug. Its withdrawal from persons who use it to excess may be followed by nausea, insomnia, muscle tremors, and anxiety.

Although complete statistics on the type of drugs used for suicide and attempted suicide by poison are not available, the evidence indicated that meprobamate had been used alone or in conjunction with other drugs in a number of cases. Several drugs are used more frequently than meprobamate for successful suicides. But one qualified researcher observed that meprobamate's use in attempted suicides was surpassed only by barbiturates.

The hearings disclosed significant diversion of meprobamate from legitimate trade. During the 1956–1966 decade, the Food and Drug Administration recorded 1,515 convictions for illegal sales of prescription drugs. Of these, 173 or approximately 11% involved meprobamate. Evidence also exposed how easily the drug can be illegally purchased.

█ The legislative history reveals that when the phrase "potential for abuse" was adopted, the House Committee rejected the suggestion that special controls should be limited "to those drugs as to which substantial abuse had been shown." The Committee Report emphasizes that the Commissioner should not be required to wait "until a number of lives have been destroyed or substantial problems have already arisen before designating a drug as subject to controls * * *."[8] Thus, the existence of abuse is relevant to forecast future

abuse, but the incidence of present abuse is not the test which the Commissioner must apply. Instead, he has been charged with the responsibility of assaying future or potential abuse. As might be expected, witnesses differed as much in their opinions about the future as they had concerning their observations of the present. However, a number of qualified experts expressed the view that as access to barbiturates was limited by controls, the abuse of meprobamate would increase unless it also was controlled. Barbiturates and meprobamate can suppress or relieve the withdrawal reaction that an excessive user of alcohol suffers when he is abruptly deprived of his intoxicant. Although most drug-prone alcoholics seek barbiturates, a significant number take meprobamate. The magnitude of the problem was illustrated by the testimony of a knowledgeable witness who expressed the opinion that of the six million alcoholics in the country, approximately four per cent (240,-000) would abuse meprobamate if they had free access to it. As an additional indicia of potential abuse, a well-informed student of suicides made "a sophisticated guess" that use of meprobamate as a suicidal agent will increase.

█ Our examination of the record as a whole leads us to conclude that meprobamate does have a potential for abuse within the meaning of the drug abuse control amendments to the Act.

█ The third element for subjecting meprobamate to special control is proof that its potential for abuse results from its depressant effect on the central nervous system. Carter-Wallace complains that the government improperly relied upon a presumption created by regulation to prove this point.[9] In its brief

---

8. H.R.Rep. No. 130, 89th Cong., 1st Sess. 7 (1965).

9. The regulation follows the President's Advisory Commission on Narcotics and Drug Abuse, Final Report, p. 2 (1963), n. 7 *supra*. The regulation [21 C.F.R. § 166.2(e)] states in part:

"(e) The Commissioner may determine that a substance has a potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect if:

"(1) There is evidence that individuals are taking the drug or drugs con-

the government disclaims any reliance on the regulation to prove a causal relationship. It contends that the regulation was intended, and used, to list the criteria for establishing a drug's potential for abuse. The regulation is not a model of clarity, and we agree with Carter-Wallace that it cannot be used to dispense with proof of the causal relation required by the statute. *Miller v. United States*, 294 U.S. 435, 440, 55 S.Ct. 440, 79 L.Ed. 977 (1935). However, our review of the record satisfies us that the government's case does not rest on a presumption. In the initial stages of the proceedings neither party placed great emphasis on this requirement of the statute, and the hearing examiner's proposed findings do not refer to it. However, the Commissioner, after hearing oral argument, remedied the hearing examiner's omission by including a new finding on this issue which states:

"The substantial evidence of record establishes that meprobamate has a potential for abuse, as manifested in the ways set forth in findings 8 through 27 above, because of its depressant effect on the central nervous system. Many of these abuses of meprobamate result from the phenomenon of tolerance to the drug and the phenomenon of withdrawal reactions upon discontinuance after long-continued or excess use. These phenomena of tolerance and withdrawal reactions are a result of meprobamate's central nervous system depressant effect. Other abuses of meprobamate stem from its euphoric effect which is a function or meprobamate's central nervous system depressant effect. In short, meprobamate's potential for abuse results from its effect of depression on the central nervous system."

Carter-Wallace, asserting this finding is not supported by substantial evidence, takes the position that there is no connection between the depressant effect of any drug and its potential to affect the health of an individual or the safety of the community.[10]

It is true that the finding is not supported by direct evidence. The present state of medical knowledge does not enable anyone to describe with certainty the means by which depressant drugs produce their effects.

Moreover, eminent scientists espouse different theories to explain effects of central nervous system depressants. Carter-Wallace's witnesses advanced the theory that therapeutic doses of mepro-

---

taining such a substance in amounts sufficient to create a hazard to their health or to the safety of other individuals or of the community; or

"(2) There is significant diversion of the drug or drugs containing such a substance from legitimate drug channels; or

"(3) Individuals are taking the drug or drugs containing such a substance on their own initiative rather than on the basis of medical advice from a practitioner licensed by law to administer such drugs in the course of his professional practice * * *."

10. Dr. Frank M. Berger, who is president of Wallace Laboratories, a wholly-owned subsidiary of Carter-Wallace, Inc., testified:

Q. "Dr. Berger, in your opinion does Meprobamate when taken at recommended doses have such a depressant effect on the central nervous system as to make it reasonable to assume the drug has substantial capability of creating hazards to the health of the user or the safety of the community?"

A. "I do not think that there is any connection between the depressant effect of Meprobamate or for that matter any other drug and its potential or capability to affect the health of an individual or of the community.

"This is a very broad statement, a very broad question.

"Health of an individual is affected if a drug is abused, if it is taken to excess. I have previously mentioned it is exceedingly rare to abuse Meprobamate. The number of individuals who have abused it is very small. As I previously mentioned, the only type of person who will abuse it is a psychopathic individual."

bamate act as a depressant on the subcortical region of the central nervous system, specifically the interneurons. In this manner it selectively blocks or interrupts circulation of anxiety producing stimuli without affecting the cortical region of the brain. Lack of effect on the cortex precludes the feeling of well-being or euphoria that in other drugs leads to addiction. Excessive doses of meprobamate may affect the cortex, but the theory postulates that by the time the cortex becomes involved, the effect upon the sub-cortical regions produces stupor and thus precludes a feeling of well-being. In contrast, the theory continues, barbiturates and alcohol have a disinhibiting effect on the cortex, which is the seat of reason. Disinhibition produces a sense of well-being, the kind of kick that calls for repetition and abuse.

Proponents of this theory assert that meprobamate's suppression of withdrawal symptoms from barbiturates and alcohol is irrelevant to the case. They believe physical dependence on a drug, and its consequent withdrawal symptoms, result from the drug's incorporation into and subsequent withdrawal from a cell. Under this theory, physical dependence and withdrawal symptoms have nothing to do with central nervous system depression.

Carter-Wallace's witnesses generally expressed opinions approving of this theory. Without exception, they saw no relation between meprobamate's potential for abuse and its depressant effect on the central nervous system. They explained meprobamate abuse by attributing it to people, not the drug. Only persons who are prone to be dependent on drugs, not normal persons, will abuse it, their argument runs. The difficulty with this thesis is that while it defines the problem, it does not provide an answer. The record describes many types of people who may become dependent on drugs—including alcoholics, they

are legion. But the record does not explain the basic psychological and physiological reasons that cause a person to abuse drugs. This is not unexpected, because present medical knowledge has no definitive explanation. We cannot, however, attribute ignorance of this situation to Congress. It knew that "[w]e lack considerable knowledge of drug abuse and how to treat it." [11] But nothing in the legislative history suggests that a drug is to escape coverage because it attracts only drug-prone people. The Commissioner's refusal to accept Carter-Wallace's thesis was not arbitrary or capricious, although the sincerity of its advocates is unquestioned.

■ Though the record contains no direct evidence or verified theories to explain meprobamate's effect, the Commissioner's order does not lack evidentiary support. Circumstantial evidence, or indirect proof, can satisfy the requirement that an administrative order be undergirded by substantial evidence. Dubin-Haskell Lining Corp. v. NLRB, 375 F.2d 568, 573 (4th Cir. 1967), cert. denied, 393 U.S. 824, 89 S.Ct. 83, 21 L.Ed.2d 95 (1968).

It is undisputed that the body's tolerance to alcohol and barbiturates can lead to excessive use of these drugs, which in turn can cause physical dependence on them. Physical dependence may become so great that abrupt deprivation of either barbiturates or alcohol will cause withdrawal symptoms. These symptoms can be suppressed or alleviated by readministering the drug. Moreover, physical dependence and withdrawal symptoms of barbiturates and alcohol are so similar that the withdrawal symptoms of alcohol may be suppressed by administering barbiturates.

Excessive use of meprobamate can cause physical dependence and withdrawal symptoms similar to those caused by barbiturates and alcohol. More significant than mere similarity, however, is the fact that meprobamate can sup-

11. The President's Advisory Commission on Narcotic and Drug Abuse, Final Report, p. 75 (1963).

press withdrawal symptoms of both alcohol and barbiturates.

A well-qualified witness testifying for the government advanced a theory to explain physical dependence on barbiturates that differed considerably from the cellular incorporation theory urged by Carter-Wallace. The government's witness testified that his research led him to believe that barbiturates have their primary site of action in the sub-cortical region, and from his studies he drew the inference that physical dependence on barbiturates seems to be primarily the result of adapted changes in the sub-cortical region alone. Other evidence tended to corroborate this theory. The witness accepted the findings that the primary site of action of meprobamate was in the sub-cortical region of the central nervous system. Emphasizing that his theory of barbiturate dependence had not yet been verified, he suggested that if it is valid for barbiturates, it may be equally valid for meprobamate.

Another comparison of meprobamate, barbiturates, and alcohol supports the Commissioner. The precise reason why some drugs cause euphoria is unknown.[12] However, credible evidence indicates that excessive use of barbiturates or alcohol can cause euphoria by depressing the central nervous system. Whether the primary site of their action is the cortex or sub-cortex is a matter of dispute, but for the purposes of this comparison the exact site is not decisive since both the cortical and sub-cortical regions are parts of the central nervous system. Substantial evidence also established that excessive use of meprobamate can cause euphoria. Euphoria can also be caused by stimulant drugs such as amphetamines. However, no evidence was introduced that euphoria results from any effect other than the action of depressant or stimulant drugs on the central nervous system.

We conclude that although the evidence is largely circumstantial, it substantially supports the Commissioner's findings that tolerance, withdrawal reactions, and euphoria are a result of meprobamate's central nervous system depressant effects. Physical dependence (as manifested by withdrawal symptoms and tolerance) and euphoria are among the characteristics of a drug that lead to its abuse. Therefore, taking into account our imperfect knowledge of how drugs injure people, we hold that substantial evidence supports the Commissioner's finding of a causal relation between meprobamate's depressant effect upon the central nervous system and its potential for abuse.

II.

Carter-Wallace manufactures five drugs containing meprobamate combined with other substances. It asserts that the combination drugs should not have been included in the Commissioner's order because the examiner reported there was a lack of substantial evidence that they have a substantial potential for significant abuse. Carter-Wallace's position, however, is not supported by the Act. Title 21 U.S.C. § 321(v) (3) provides that the term depressant drug means a drug which contains any quantity of a substance that has a potential for abuse because of its depressant effect on the central nervous system. Since the combination drugs contain meprobamate, a substance satisfying the definition of a depressant drug, they are covered by the plain language of the Act. The Court emphasized in United States v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134, 88 L.Ed. 48 (1943), that the Act touches the lives and health of people, and it should not be narrowly

---

12. Euphoria is defined as "a feeling of well-being or elation, especially one that is groundless, disproportionate to its cause, or inappropriate to one's life situation." Webster's Third New International Dictionary (unabridged 1964).

Witnesses described euphoria as a state of artificial happiness or elation of mood; or, an abnormal state of well-being, quite different in quality and intensity from a healthy state of well-being.

construed. Certainly we see no reason for excluding drugs that are literally encompassed by its terms.

An exemption from coverage of combination drugs is provided by 21 U.S.C. § 360a(f) (2), which states in part:

"(2) The Secretary shall by regulation exempt any depressant or stimulant drug from the application of this section, if—.

\* \* \* \* \* \*

"(B) he finds that such drug includes one or more substances not having a depressant or stimulant effect on the central nervous system \* \* \* and such substance or substances are present therein in such combination, quantity, proportion, or concentration as to prevent the substance or substances therein which do have such an effect from being ingested or absorbed in sufficient amounts or concentrations as, within the meaning of section 321(v) of this title, to—

\* \* \* \* \* \*

"(ii) have a potential for abuse because of their depressant or stimulant effect on the central nervous system \* \* \*."

In this hearing the government was required to show only that meprobamate satisfied the Act's definition of a depressant drug and that the combination drugs contained meprobamate. Lack of evidence concerning the effect of the combination drugs cannot be substituted for the affirmative findings required for exemption. Proceedings for exemption may be initiated by the Commissioner or by Carter-Wallace. 21 C.F.R. § 166.7 (1968). Neither the Commissioner's order nor our affirmance precludes prompt action to determine whether the combination drugs should be exempted.

### III.

Carter-Wallace alleges that a number of the trial examiner's rulings deprived it of a fair hearing. At a pre-trial conference a week before the hearing, the government indicated that it would use documents aggregating 2,550 pages. Carter-Wallace complains that the hearing examiner denied its motion for a continuance of an additional week to allow time for examination of the government's documents. The grant or denial of continuances lies within the sound discretion of a hearing examiner, NLRB v. A. J. Siris Products Corp., 186 F.2d 502 (4th Cir. 1951), and we find no abuse of discretion here. Carter-Wallace had six months to prepare its case, and many of the documents proffered by the government came from Carter-Wallace's own files. The hearings lasted for nearly three months, and during that time Carter-Wallace had ample opportunity to examine the documents. Moreover, it has shown no specific instances of how its lack of opportunity to study the documents for an additional week before the hearing prejudiced its case.

Carter-Wallace objected to government exhibit 202, which is a summary purporting to show, among other things, that an audit of 99 pharmacies disclosed a shortage of 796,000 tablets of meprobamate. The shortage represented 77% of the total amount of the drug received by the pharmacies in a one-year period. The witness through whom the summary was introduced was not familiar with all of the underlying data, and some of the underlying documents were not available for use in cross-examination. While hearsay evidence is generally admissible in an administrative hearing, we think the deficiencies concerning the underlying data made it difficult for the government to establish the reliability of its audit and precluded meaningful cross-examination by Carter-Wallace. See McDaniel v. United States, 343 F.2d 785, 789 (5th Cir.), cert. denied, 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965); In Re Shelley Furniture, Inc., 283 F.2d 540, 543 (7th Cir. 1960).

However, other evidence supports the finding that there has been a significant diversion of meprobamate from legitimate channels. Furthermore, proof of the drug's potential for abuse does not rest solely upon showing its diversion. Other findings, amply supported, suffice to establish that meprobamate has a potential for abuse. Introduction of exhibit 202, therefore, is not cause for setting aside the Commissioner's order. Willapoint Oysters, Inc. v. Ewing, 174 F.2d 676, 690 (9th Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949).

Carter-Wallace's complaint about the introduction of other hearsay on the ground that it was denied its right of cross-examination is without merit. Over Carter-Wallace's objection, the examiner permitted a physician employed by the Food and Drug Administration to introduce records showing adverse effects of meprobamate. Carter-Wallace complained that the doctors and hospital officials who reported the cases were not available for cross-examination and that the witness could not attest to the accuracy of the records by her own personal knowledge. The records, however, had been furnished the Food and Drug Administration by Carter-Wallace in accordance with a manufacturer's duty to report adverse reaction in connection with new drug applications. Thus Carter-Wallace had ample opportunity to investigate the accuracy of the reports. Indeed, considering the nature of the reports, it is unlikely that it did not do so. Other documents admitted over Carter-Wallace's objection were articles concerning meprobamate published in recognized scientific journals. Carter-Wallace, of course, had full opportunity to examine the government's expert witness on her opinion of the validity of the scientific opinions that were expressed. We find no abuse of the examiner's discretion in the admission of these exhibits. Rocker v. Celebrezze, 358 F.2d 119, 122 (2d Cir. 1966); Montana Power Co. v. Federal Power Comm., 87 U.S.App.D.C. 316, 185 F.2d 491, 498 (1950), cert. denied, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 (1951).

Carter-Wallace complains that in contrast to the examiner's admission of scientific papers offered by the government, a pertinent paper which it sought to introduce was excluded. This unpublished paper was of recent origin. Its author had conferred with Carter-Wallace's attorneys in the town where the hearings were held the night before the session at which the paper was submitted. Carter-Wallace, however, did not call the author as a witness, but instead sought to introduce the paper through its vice-president. Under these unusual circumstances, the examiner did not abuse his discretion by ruling that the paper could not be introduced unless the government had an opportunity to cross-examine the author.

We agree with Carter-Wallace that the examiner erroneously ruled that three papers written by the president of Wallace Laboratories, were irrelevant. However, the author testified at great length, and the exhibits were largely cumulative. Their exclusion was not reversible error. Cf. United States for Use and Benefit of Carter v. Ross Corporation, 385 F.2d 564, 566 (6th Cir. 1967). See 2 Davis, Administrative Law § 14.09, p. 291 (1958). Carter-Wallace's contention that the examiner was biased is not supported by the record. We find no merit in its other complaints about the conduct of the hearing or in its charge that the examiner and the Commissioner ignored its evidence.

The order of the Commissioner is affirmed.