Bertha K. ADAMS, as Administratrix of the Estate of George F. Adams, Deceased, Plaintiff,

v.

The MONTANA POWER COMPANY, a Montana corporation, Defendant.

Civ. No. 2115.

United States District Court, D. Montana, Helena Division.

Feb. 22, 1973.

Charles A. Smith, Smith & Harper, and Robert T. Cummins, Helena, Mont., for plaintiff.

Gough, Booth, Shanahan & Johnson, Helena, Mont., for defendant.

OPINION AND ORDER

RUSSELL E. SMITH, Chief Judge.

George F. Adams was drowned when a small boat in which he was riding capsized in the discharge from the Montana Power Company's Hauser dam in the Missouri River. Plaintiff urges that this action is within the admiralty jurisdiction of the court.

Congress[1] and the courts (Montana Power Co. v. Federal Power Commission, 87 U.S.App.D.C. 316, 185 F.2d 491 (1950)) have declared the Missouri navigable, and I think it now beyond dispute that the river is navigable in the sense that the federal government has jurisdiction over it under the commerce clause (U.S.Const. art. I, § 8). The fact (judicially noted) is that Hauser dam and Holter dam are about 25 miles apart and that they completely obstruct the river. The commerce on this stretch of river is the commerce of any inland lake in Montana—small boats, fishermen, water skiers. The cargoes carried are fishing tackle and picnic baskets. The question is not whether there is federal jurisdiction over the Missouri as a navigable water but whether the law of admiralty should be held to govern all of the happenings on it.

Under the "locality rule," once rather generally accepted, if a tort occurred on what was a navigable water then admiralty jurisdiction automatically followed. When the Supreme Court refused to mechanically apply the locality rule to an aircraft crash on Lake Erie in Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (Dec. 18, 1972), it diminished the binding force of the label "navigable water" and freed the courts to make a wider inquiry into the admiralty jurisdiction problem.

In Executive Jet Aviation, Inc. v. Cleveland, *supra,* the Court considered

1. 33 U.S.C. §§ 2.20–5 and 2.48–1.

the origins and development of admiralty law:

. . . The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules—rules that govern the manner and direction those vessels might rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.

It is clear that admiralty law developed out of the need of the commerce on the seas for a law which related to the needs of that commerce. At one time only waters affected by the ebb and flow of the tide were navigable for the purpose of admiralty jurisdiction. The Steam-Boat Thomas Jefferson, 23 U.S. (10 Wheat.) 428, 6 L.Ed. 358 (1825); The Steam-Boat Orleans v. Phoebus, 36 U.S. (11 Pet.) 175, 9 L.Ed. 677 (1837). It is noteworthy that when the Supreme Court extended the admiralty jurisdiction to waters unaffected by the tide it did so because of the needs of the commerce on our inland waterways. Thus, in The Propeller Genesee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851), the court carefully explained that the rule confining the application of admiralty jurisdiction to tidewater came about because, in the days of sails, navigation was confined to the tidewater. In breaking from this historic tidewater limitation the Court, through Justice Taney, said:

. . . These lakes are in truth inland seas. Different States border on them on one side, and a foreign nation on the other. A great and growing commerce is carried on upon them between different States and a foreign nation, which is subject to all the incidents and hazards that attend commerce on the ocean. Hostile fleets have encountered on them, and prizes been made; and every reason which existed for the grant of admiralty jurisdiction to the general government on the Atlantic seas, applies with equal force to the lakes. There is an equal necessity for the instance and for the prize power of the admiralty court to administer international law, and if the one cannot be established neither can the other.

Obviously Justice Taney envisioned maritime commerce as something different from the travel of rowboats and canoes. It was the maritime activity on the inland waters which both required and accomplished the extension of maritime law to the inland waters. The term "navigable" was a useful word to describe the places where the commerce took place, but it was the needs of the commerce rather than the description of the water which established admiralty jurisdiction.

In terms of the obligation of a federal government to exercise control over waterways which are or may be useful as arteries of commerce, Congress and the courts are probably justified making determinations of navigability on the basis of minimal commerce, recited by the court in Montana Power Co. v. Federal Power Commission, 87 U.S.App.D.C. 316, 185 F.2d 491 (1950), and employing the legal proposition "when once found to be navigable, a waterway remains so." If, however, the problem is what body of law should govern the activities on a particular stretch of water, then it seems unrealistic to ignore the facts. There is now nothing resembling traditional maritime activity [2] on the Mis-

2. This phrase is repeatedly used in Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (Dec. 18, 1972).

souri between Hauser dam and Holter dam, nor is there likely to be.

As I see it, the activities of swimmers, boaters, water skiers, and fishermen on those Montana waters on which there is no traditional maritime activity should be regulated by local law. Factually the use of the water between Holter and Hauser dams and Hebgen Lake (a man-made, non-navigable lake) cannot be distinguished. The application of different tort rules to them could be justified only by reason of the kind of need for the imposition of admiralty law specified in The Propeller Genesee Chief v. Fitzhugh, *supra*. That need does not exist and to paraphrase the Supreme Court in Executive Jet Aviation, Inc. v. Cleveland, *supra*, the Montana courts could plainly exercise jurisdiction over this action and could apply familiar concepts of Montana tort law without any effect on maritime endeavors.

The action is dismissed for want of jurisdiction.