478 F.2d 1
 HOFFMANN-La ROCHE, INC., Petitioner,
v.
Richard G. KLEINDIENST, Attorney General of the United
States, and John E. Ingersoll, Director, Bureau of
Narcotics and Dangerous Drugs, United
States Department of Justice,
Respondents.
 No. 71-1299.
 United States Court of Appeals,
Third Circuit.
 Argued June 25, 1971.
Decided March 28, 1973.
As Amended July 3, 1973.
 
 Thomas D. Finney, Jr., John J. Kovin, Thomas Richard Spradlin, Clifford, Warnke, Glass, McIlwain & Finey, Washington, D. C., Ralph N. Del Deo, Crummy, O'Neill, Del Deo & Dolan, Newark, N. J., for petitioner.
 Allan P. Mackinnon, U.S. Dept. of Justice, Washington, D. C., for respondents.
 Before BIGGS and ROSENN, Circuit Judges, and KRAFT, District Judge.
 OPINION OF THE COURT
 BIGGS, Circuit Judge.
 
 
 1
 The petitioner, Hoffmann-La Roche, Inc. (Hoffmann), has brought this special statutory proceeding against the Honorable Richard G. Kleindienst, Attorney General of the United States, and John E. Ingersoll, Director of the Bureau of Narcotics and Dangerous Drugs of the United States Department of Justice (respondents), to review a Final Order issued by the Director, filed on February 5, 1971 (36 Fed.Reg. 2555 (1971)).[1] The proceedings were commenced pursuant to Sec. 201(v) of the 1965 Amendments to the "Federal Food, Drug, and Cosmetic Act"[2] and were proceeded with under the "Comprehensive Drug Abuse Prevention and Control Act of 1970." Title II of the 1970 Act deals with the control of drugs and is separately entitled the "Controlled Substances Act," 21 U.S.C. Sec. 801 et seq.[3] Review is sought pursuant to 21 U.S.C. Sec. 371(f) and 5 U.S.C. Sec. 706, formerly Section 10(e) of the Administrative Procedure Act.
 
 
 2
 Chlordiazepoxide[4] (Librium) and diazepam (Valium) are described as a new class of drugs which differ chemically from barbiturates and other drugs known at the time of their synthesis. Librium has been in general medical use since 1960 and Valium since 1963. In 1966 at the original hearing before the Bureau it was estimated that over fifteen million patients had taken Librium and over five million patients had received doses of Valium. The 1965 Act set up special controls over the prescription and distribution of "depressant and stimulant drugs." Depressant or stimulant drugs" were defined to include barbiturates, amphetamines, and any other drug which the Secretary of Health, Education and Welfare designated by regulation as having a potential for abuse because of its depressant or stimulant effect on the central nervous system.
 
 
 3
 The legislative history of the Act must be referred to. Very relevant to that history is the Final Report of the President's Advisory Commission on Narcotics and Drug Abuse, at 2 (1963), which states: "When this report speaks of 'drug addiction' it is using the term in its full technical sense to include both the psychological and the physical dependence. When it speaks of 'drug abuse' it is referring to the broader problem which includes also those drugs which create only psychological dependency. We will use the term 'drug abuse' in this report as existing when an individual takes psychotoxic drugs under any of the following circumstances: (a) in amounts sufficient to create a hazard to his own health or to the safety of the community; or (b) when he obtains drugs through illicit channels; or (c) when he takes drugs on his own initiative rather than on the basis of professional advice. Drug abuse today involves not only the narcotic drugs and marihuana, but to an increasingly alarming extent other drugs such as the barbiturates, the amphetamines and even certain of the 'tranquilizers.' This latter group will be referred to in this report as the 'dangerous drugs.' "
 
 
 4
 Regulation 21 C.F.R. Sec. 166.2(e) (1967), follows the Final Report of the President's Advisory Commission on Narcotics and Drug Abuse, supra at 2, and states in part as follows: "(e) The Commissioner may determine that a substance has a potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect if: (1) There is evidence that individuals are taking the drug or drugs containing such a substance in amounts sufficient to create a hazard to their health or to the safety of other individuals or of the community; or (2) There is significant diversion of the drug or drugs containing such a substance from legitimate drug channels; or (3) Individuals are taking the drug or drugs containing such a substance on their own initiative rather than on the basis of medical advice from a practitioner licensed by law to administer such drugs in the course of his professional practice * * *"
 
 
 5
 This case was begun by a proposed regulation filed by Acting Commissioner Rankin on January 17, 1966.[5] 31 Fed. Reg. 565 (1966). The issues presented by this, the present proceeding, were stated to be as follows in the notice of May 16, 1966:[6] "1. Whether there is evidence that individuals are taking the drug or drugs [Librium or Valium] containing such substances in amounts sufficient to create a hazard to their health or to the safety of other individuals or of the community; 2. Whether there is evidence of significant diversion of the drug or drugs [Librium or Valium] containing such substances from legitimate drug channels; 3. Whether there is evidence that individuals are taking the drug or drugs [Librium or Valium] containing such substances on their own initiative rather than on the basis of medical advice from a practitioner licensed by law to administer such drugs in the course of his professional practice; and 4. Whether, if chlordiazepoxide [Librium] has been the subject of abuse, diazepam [Valium], a newer drug, is so related to it as to make it likely that the drug will have the same potentiality for abuse." 31 Fed.Reg. 7174 (1966) The proceeding culminated in the Final Order of Director Ingersoll filed February 5, 1971,[7] ruling that chlordiazepoxide and its salts, and diazepam, respectively Librium and Valium, were depressant drugs having a potential for abuse because of their depressant effect on the central nervous system. This is the order which we review here. If the order is sustained, Librium and Valium, already available only upon prescriptions of licensed physicians, will be subject to additional record-keeping, inspection, regulation, and labeling requirements by legitimate channels of distribution. Moreover, illicit, i. e., non-allowable, possession and distribution would be illegal and subject to criminal sanctions as is presently the case in respect to barbiturates and amphetamines, commonly considered as "depressant" and "stimulant" drugs. Hoffmann concedes that Librium is a depressant drug. "The conclusion that Librium has a depressant effect is not controverted." Hoffmann's brief at 9. Hoffmann objected to Librium and Valium being made subject to regulation, filed its petition for review and injunctive relief, and this court stayed Director Ingersoll's Final Order until our disposition of the case.[8]
 
 
 6
 The issues presented are rather hard to frame for they are differently stated by the parties. Hoffmann asserts in its brief at 1-2: "The issues are whether the order of the Director should be held unlawful and set aside because-(1) the order is in excess of statutory authority or limitation in that it employs a decisional standard different from that established by Congress; (2) the conclusions as to chlordiazepoxide (Librium) are not supported by adequate findings or substantial evidence on the whole record; (3) the listing of diazepam (Valium) cannot be based on the experience with Librium, and the conclusions as to Valium are not supported by adequate findings or substantial evidence on the whole record; and (4) the order was issued without observance of procedure required by law and due process." The respondents' "Counterstatement of the Issues Presented for Review" is as follows: "1. Whether the findings of the Director, Bureau of Narcotics and Dangerous Drugs, that Librium and Valium are 'depressant drugs' subject to control under the Drug Abuse Control Amendments of 1965, are supported by substantial evidence of record. 2. Whether the Administrative order listing Librium and Valium as drugs subject to control under the Drug Abuse [Control] Amendments of 1965 should be set aside on the ground that it was entered without due process of law." Another issue which we disignate as "(3)" and which must be discussed is whether the proceedings before the Director were "rule making" or "adjudication," as defined in 5 U.S.C. Sec. 551(5) and 5 U.S.C. Sec. 551(7).[9]
 
 I.
 
 7
 We deal first with this case on the basis of the evidence which was before the Director, without regard to the matters discussed under the later headings of this opinion. Hoffmann contends that the Director's order is based on a decisional standard different from that established by the statute and that the agency has not met the requirements of the applicable statutes in that " ' the agency must make findings that support its decision and those findings must be supported by substantial evidence.' [Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 [83 S.Ct. 239, 9 L.Ed.2d 207] (1962)] Moreover, mere 'conclusionary statements . . . are not the sort of findings which enable [the Court] intelligently to pass upon the correctness of the judgment reached.' 'The agency's findings must . . . be sufficiently definite to enable the courts to perform the task of judicial review.' [Braniff Airways, Inc. v. Civil Aeronautics Board [113 U.S.App.D.C. 132] 306 F.2d 739, 742 (D.C.Cir. 1962)]."
 
 
 8
 The applicable law is cogently set out by Judge Butzner in Carter-Wallace, Inc. v. Gardner, 417 F.2d 1086 (4 Cir. 1969), in which Carter-Wallace, Inc. attacked a Food and Drug Administration order subjecting meprobamate to control as a depressant drug. The court stated: "In selecting 'potential for abuse' as one of the criteria for subjecting a drug to special control, the House Committee did not intend this to be determined on the basis of the drug's having a potential for isolated or occasional nontherapeutic purposes. Instead, the committee recommended that a drug's potential for abuse should be determined 'on the basis of its having been demonstrated to have such depressant or stimulant effect on the central nervous system as to make it reasonable to assume that there is a substantial potential for the occurrence of significant diversions from legitimate drug channels, significant use by individuals contrary to professional advice, or substantial capability of creating hazards to the health of the user or the safety of the community."[10]
 
 
 9
 The principles of law and criteria enunciated in Carter-Wallace, supra at 1090, we believe to be sound and we adopt them.
 
 
 10
 The "Conclusions of Law" reached by the Director are as follows:[11]
 
 
 11
 "1. The Drug Abuse Control Amendments of 1965 were intended to protect the public health and safety by establishing special controls for depressant and stimulant drugs. This protection was to be accomplished through increased record keeping and inspection requirements, through providing for control over intrastate traffic in these drugs because of its effect on interstate traffic, and through making possession of these drugs, other than by the user, illegal outside of the legitimate channels of commerce.
 
 
 12
 "2. Chlordiazepoxide (Librium) and diazepam (Valium) are drugs with a depressant effect on the central nervous system. They may be legitimately dispensed only upon the prescription of a practitioner licensed by law to administer such drugs, and in full conformity with section 503(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 353(b).
 
 
 13
 "3. The substantial, probative, and reliable evidence of record establishes that chlordiazepoxide (Librium) due to its depressant effect on the central nervous system has been abused in the past in the following ways:
 
 
 14
 "(a) There has been significant use of chlordiazepoxide (Librium) in amounts sufficient to create a hazard to the health of the individual and to the safety of other individuals and the community.
 
 
 15
 "(b) There has been significant diversion of chlordiazepoxide (Librium) from legitimate channels.
 
 
 16
 "(c) There has been significant use of Librium by individuals on their own initiative rather than on the basis of medical advice from a practitioner licensed by law to administer such drugs in the course of his professional practice.
 
 
 17
 "4. Due to the past history of abuse of chlordiazepoxide (Librium), because of its established capacity to substitute for other sedative drugs which are known to be abused and which are now subject to increased controls of the amendments, it is reasonable to conclude that the abuse of chlordiazepoxide (Librium) will continue to increase unless this drug is similarly brought under the control of the amendments.
 
 
 18
 "5. The substantial, probative, and reliable evidence of record establishes that diazepam (Valium) due to its depressant effect upon the central nervous system has been abused in the past in the following manner:
 
 
 19
 "(a) There has been significant use of diazepam in amounts sufficient to create a hazard to the health of the individual and to the safety of other individuals and the community.
 
 
 20
 "(b) There has been significant use of diazepam (Valium) by individuals on their own initiative rather than on the basis of medical advice from a practitioner licensed by law to administer such drugs in the course of his professional practice.
 
 
 21
 "6. Diazepam (Valium), the newer drug, is so related to chlordiazepoxide (Librium), a drug for which there is considerable evidence of continuing abuse as to make it likely that it will have the same potentiality for abuse.
 
 
 22
 "7. Due to past history of abuse of diazepam (Valium), because of its close relation to chlordiazepoxide (Librium), and because of its established capacity to substitute for other sedative drugs which are known to be abused and which are now subject to controls under the provisions of the Drug Abuse Control Amendments of 1965, it is reasonable to conclude that the abuse of diazepam (Valium) will continue to increase.
 
 
 23
 "8. Chlordiazepoxide (Librium) and diazepam (Valium) are drugs which because of their depressant effect on the central nervous system, have a substantial potential for significant abuse within the meaning of the Amendments, 21 U.S.C. 321(v)(3).
 
 
 24
 "9. Chlordiazepoxide (Librium) and diazepam (Valium) are 'depressant or stimulant drugs' within the meaning of 21 U.S.C. 321(v), and are therefore subject to the provisions of 21 U.S.C. 360a. Any drug which contains any quantity of chlordiazepoxide or diazepam is a 'depressant or stimulant drug' within the meaning of 21 U.S.C. 321(v)(3) and is also subject to the provisions of 21 U.S. C. 360a.
 
 
 25
 "Therefore, it is ordered, That the stay of effectiveness announced May 17, 1966 (31 F.R. 7174), on the listing of chlordiazepoxide and its salts and diazepam in Sec. 166.3(c)(1) [redesignated Sec. 320.3(c)(1)] as a drug subject to control under the Amendments by the order of March 19, 1966 (31 F.R. 4679), be ended."
 
 
 26
 The last paragraph of this order brought its terms into effect until stayed by the order of this court.
 
 
 27
 The amount of evidence presented in this case has been enormous. The Findings of Fact contained in the Final Order of the Director, as set out hereinafter, and the references to their supporting evidence, we deem to be sufficient for the purposes of this opinion.
 
 
 28
 "1. The benzodiazepines, of which chlordiazepoxide (Librium) was the first synthesized, are a new class of drugs, different chemically from the barbiturates or any other drugs known at the time of their syntheses (Zbinden, Tr. 2080-84; R-142C; R-119; Lofft, Tr. 531).
 
 
 29
 "2. Chlordiazepoxide (Librium) is a benzodiazepine compound with the following chemical formula: 7-chloro-2-methylamino-5-phenyl-3H-1, 4-benzodiazepine 4-oxide hydrochloride. It is a colorless crystalline substance; is soluble in water and its molecular weight is 336.22 (R-119).
 
 
 30
 "3. Diazepam (Valium) is a benzodiazepine derivative with the following chemical formula: 7-chloro-1, 3-dihydro-1-methyl-5-phenyl-2H-1, 4-benzodiazepine-2-one. It is a colorless crystalline compound insoluble in water and its molecular weight is 284.74 (R-120).
 
 
 31
 "4. Experimental studies of their effects in animals were conducted by the Respondent. These tests indicated that Librium and Valium are depressant drugs having a marked calming action on the central nervous system at lower doses. An increase in dose resulted in more pronounced effects on the central nervous system, i. e., drowsiness, motor incoordination or ataxia, and sleep. On the basis of specially designed experiments whereby excitation was induced by surgical or chemical means, or by putting the animals under stressful conditioned behavior situations, the benzodiazepines produced an antiexcitatory effect at dose levels below those that caused neurotoxicity or over-sedation, thus suggesting a usefulness in the treatment of anxiety and tension. The benzodiazepines are not generally recognized as effective sedative-hypnotic agents within the normal dosage range. (Zbinden, Tr. 2199-2204; R-142; Lang (1963), R-145; Heise (1961), R-146).
 
 
 32
 "5. The Respondent also presented evidence concerning the results of experimental tests on animals, designed to determine the primary site of action of the benzodiazepines. Primary site of action is defined to mean to location in the brain where a drug at the lowest dose will produce an effect. It is believed that the primary site of action of these drugs is in the subcoritical structures of the brain. The precise site of action cannot be determined with certitude. Dr. Gerhard Zbinden of Roche Laboratories stated that their tests showed it to be in the hippocampus (Tr. 2187-88). However, Dr. Harold Himwich, another Respondent witness, testified that his tests showed that the area most sensitive to low doses of Librium and Valium, was in the transmission from the amygdala to the hippocampus (Tr. 2677). Moreover a doubling of the dose in these tests done at Roche Laboratories resulted in the drug effect spreading to the cortex, the area of the brain associated with judgmental functions. (Zbinden, Tr. 2187; R-142S). When the dose was further increased the whole brain was involved. (Tr. 2188).
 
 
 33
 "6. Librium and Valium are widely used in the treatment of anxiety and tension, as muscle relaxants, as anticonvulsants, and as anti-depressants.
 
 
 34
 "7. Librium has been in general medical use since 1960. More than 6 billion capsules of the drug have been commercially distributed, and millions of patients have taken Librium since its approval by the Food and Drug Administration (Bennett, Tr. 4135-36; R-222).
 
 
 35
 "8. Librium is indicated whenever fear, anxiety and tension are significant components of the clinical profile.
 
 
 36
 "In low oral doses, the drug is effective in mild to moderate anxiety and tension, tension headache, pre- and post-operative apprehension, premenstrual tension and menstrual stress, chronic alcoholism, behavior disorders in children, and whenever anxiety and tension are concomitants of gastrointestinal, cardiovascular, gynecologic or dermatologic disorders.
 
 
 37
 "Skeletal muscle spasticity (resulting from spinal cord injury, congenital or acquired brain damage) and other debilitating neuro-muscular disorders such as dystonia and athetosis frequently respond to Librium. Painful muscle spasm associated with myositis, fibrositis, bursitis, tenosynovitis, arthritis, fractures, intervertebral disc syndrome, whiplash injury, low back pain or postural strains is often benefited when emotional factors are present.
 
 
 38
 "In higher oral doses, Librium is of value in the more severe anxiety and tension states, agitated depression and ambulatory psychoneuroses (e. g., acute and chronic anxiety states, phobias, obsessive-compulsive reactions and schizoid behavior disorders). In addition, it may be useful in certain types of acute agitation due to chronic alcoholism or alcoholic withdrawal (including delirium tremens), hysterical or panic states, paranoid states and acute stages of schizophrenia (R-119).
 
 
 39
 "9. Diazepam (Valium) is of use in dealing with anxiety reactions stemming from stressful circumstances or whenever somatic complaints are concomitants of emotional factors. It is useful in psychoneurotic states manifested by anxiety, tension, fear and fatigue. Valium may also be useful in acute agitation due to alcohol withdrawal. Valium may be of use to alleviate muscle spasm associated with cerebral palsy and athetosis (R-119)."[12]
 
 
 40
 Finding 15, 36 Fed.Reg., at 2556, states: "Substantial evidence of record establishes that individuals have developed psychic dependence to Librium and Valium. The uncontested testimony of physicians was that patients find the two drugs pleasant to take. (Murray, Tr. 364; Barten, Tr. 454; Evans, Tr. 813-15, 829-30). They provide an inner sensorial feeling that is gratifying to the patient (Uzee, Tr. 907). Patients were reported to have been apprehensive about being without their supply of the medication and expressed to their physicians a reluctance to come off the drugs. Individuals have attempted unsuccessfully to discontinue taking Librium and Valium when a dependency has developed. Still other patients have gone to excessive lengths to maintain their supply of the two drugs. (Lofft, Tr. 1560; Evans, Tr. 817, 825; Uzee, Tr. 905-06; Galen, Tr. 1443-48; Chelton, Tr. 1672; Williams, Tr. 1757-59; Guile (1963), G-14; Lingjerde (1965), G-55; Wenkstetten (1965), G-91, Table 3; Kranz (1965), G-94, pp. 8-9). This experience confirms the opinion expressed by experts that Librium and Valium are drugs to which individuals can and do develop psychic dependence. (Eddy, Tr. 1077; Isabell [sic], Tr. 1552-54; Eddy, et al. (1965), G-81, 727." An examination of the citations of Finding 15 shows that there is substantial evidence that individuals have developed psychic dependence to Librium and Valium. Therefore, one of the elements necessary for a demonstration of "substantial potential for significant abuse" is present as found by the Director. True, there is evidence to the contrary, as the Director acknowledges in his Finding of Fact 16, but we are not judges of the evidence for the reasons set out hereinafter.
 
 
 41
 We think it is well established that drugs which are capable of producing euphoria are peculiarly susceptible to being abused. Finding of Fact 17 of the Final Order defines "Euphoria" as "an exaggerated sense of well being." (21 C.F.R. 166.2(c)(2) (1967). "The evidence establishes that euphoria has been reported following use of Librium and Valium. (Barten, Tr. 454; Chambers, Tr. 1628; Domino, Tr. 4617; Zbinden et al. (1961), R-118, pp. 627, 634; Guile (1963), G-14, p. 57; Towler et al. (1962), R-73, 833; Darling (1963), G-48, p. 502." 36 Fed.Reg., at 2556. Checking out these citations we find there is sufficient evidence to support the finding that Librium and Valium produce euphoria albeit the evidence in this respect cannot be characterized as very ample or very persuasive.
 
 
 42
 "Tolerance" is described in Finding of Fact 19 as ". . . an adaptive process which contributes to abuse because, where it exists, a person tends continually to increase the amount of drug being taken. Tolerance has developed when, after repeated administration, a given dose of a drug produces a decreasing effect or conversely when increasingly larger doses must be administered to obtain the effects observed with the original dose (Jaffe (1965), R-113, p. 285; Deneau, Tr. 1009)." 36 Fed.Reg., at 2557. We accept this definition. Finding of Fact 22 states: "The evidence establishes that it is possible to develop tolerance to Librium and Valium but that it has not been frequently observed or reported." But the same finding states: "There was . . . evidence that patients have increased their dosage in order to maintain relief of anxiety (Uzee, Tr. 913, 919; Mr. E, Tr. 494-95; Lingjerde (1965), G-55, p. 3). To date however, there have been few such reports in the medical literature and Respondent's witnesses have testified that tolerance to Librium and Valium has not been encountered in extensive use over many years (Gibbs, Tr. 2263-64; D. Feldman, Tr. 2532-33; Bercel, Tr. 2653-54, 2657; Scherbel, Tr. 2821; Goldman, Tr. 2914; Friend, Tr. 2937; Cohen, Tr. 3218, 3220; Schwab, Tr. 3383-84; D. Feldman, Tr. 3682; Knott, Tr. 3716; D'Agostino, Tr. 3817; Stanfield, Tr. 3844; Snell, Tr. 3884; Smith, Tr. 3924; Schiele, Tr. 4033; Greenberg, Tr. 4060)." 36 Fed.Reg., at 2557. The evidence of tolerance developing from repeated doses of Librium and Valium is not too strong, and if we had this case de novo we would not make the finding as did the Director on the citations of evidence stated in the finding. However, the statement made by the Director in Finding 22 that the evidence does establish that it is possible to develop tolerance to Librium and Valium is supported by the record.
 
 
 43
 Another factor in determining a drug's potential for abuse is the existence of withdrawal symptoms. As to withdrawal symptoms associated with Librium and Valium, Finding 34 seems to us to be conclusive. That Finding states: "Dr. John G. Lofft, a psychiatrist and specialist in the treatment of alcoholism and allied addictions, testified that the abstinence syndrome associated with Librium and Valium withdrawal compares to that experienced after abrupt withdrawal from barbiturates (Tr. 550). It is characterized in its mildest form by insomnia and increased anxiety (Tr. 548-49). When the patient has been taking elevated doses for long periods of time the withdrawal syndrome is marked by restlessness, tremulousness, muscle pains, perspiration, hallucinations, and sometimes, although not frequently, convulsive seizures (Tr. 540, 543, 547). The severity of the withdrawal is dependent upon the degree of dependence, and the amount of drug the person has been taking (Tr. 551-52; Jaffe (1965), R-133, p. 289). Librium-Valium withdrawal differs from the barbiturate withdrawal syndrome in that it persists over a longer period of time (Lofft, Tr. 550-51)." 36 Fed.Reg., at 2558. There is ample evidence to support this finding.
 
 
 44
 Finding 38 seems to supply a strong basis for the regulation proposed under the Drug Abuse Control Amendments of 1965. It is as follows: "There was some evidence indicating that Librium may produce a paradoxical rage reaction, i. e., an excitable and exhilarated state whereby the individual may become a danger to himself and to others. This reaction has been manifested in isolated instances by a hostile and irritable mood to a point where the person taking Librium has become violent and has physically threatened the lives of others (Murray, Tr. 355-56, 357-59, 360-63; Barten, Tr. 447; Lofft, Tr. 558; Gibbs, Tr. 2254-55; Stanfield, Tr. 3860-61; Murray (1962), G-24; Bowes (1965), G-44, p. 338; Krakowski (1963), G-51, p. 49; Dean (1962), R-70, p. 4)." 36 Fed.Reg., at 2558. An examination of the citations supports the finding.
 
 
 45
 Is there a substantial potential for occurrence of significant divergence from legitimate drug channels, significant use by individuals of Librium and Valium contrary to professional advice, or substantial capability of creating hazards to the health of the user and the safety of the community? See again H.R.Rep. No. 130, 89th Cong., 1st Sess. 7 (1965), set out above.
 
 
 46
 There is evidence which supports Finding 40 that pharmacists are distributing amounts of Librium without authorization from physicians, i.e., substantial diversion from legitimate drug channels. Finding 40 is as follows: "The evidence indicates that some pharmacists are distributing amounts of Librium without authorization from physicians. During a 5-year period extending from 1961 through 1965, U.S. Food and Drug Administration records show that there were 35 completed prosecutions involving the drug chlordiazepoxide, all of which were terminated in convictions. These 35 cases involved 132 illegal buys of the drug, made either without a prescription or as requests for a refill when no refill was authorized. Investigations in three of these cases were initiated following complaints that a druggist had illegally dispensed Librium (Clevenger, Tr. 1846). At the close of the investigations in 14 of these cases, Food and Drug Inspectors checked the records, invoices, and prescription files of the drugstores involved. On the basis of investigation it was estimated that in each case between 47 percent and 100 percent of the pharmacies' supply of chlordiazepoxide had been dispensed without authorization of a physician. An average of 75 percent of the total amount of the drug dispensed by the pharmacists involved in these instances could not be accounted for. This amounted to over 54,000 capsules (Clevenger, Tr. 1799-1807, 1815, 1834-36; G-268). See also Ashcraft, Tr. 1158, 1519; Witness X, Tr. 1895-97 for other evidence to the same effect." 36 Fed.Reg., at 2558. See also Findings 41 to 46, inclusive. 36 Fed.Reg., at 2559. All of these findings are amply supported by evidence.
 
 
 47
 Hoffmann places great emphasis on 5 U.S.C. Sec. 706, formerly Sec. 10(e) of the Administrative Procedure Act which provides that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "contrary to constitutional right," "in excess of statutory . . . authority," "without observance of procedure required by law," or "unsupported by substantial evidence." The section further requires that, "In making the foregoing determinations, the court shall review the whole record. . . ." We do not disagree, nor do the respondents, with the statement of the law. We have reached the conclusion that the Director's Final Order and his Findings of Fact and Conclusions of Law are in accordance with 5 U.S.C. Sec. 706, and we are compelled to the conclusion, as was he, that Librium is a drug having a depressant effect on the central nervous system (as conceded) and that it has a substantial potential for significant abuse. We believe that it must be conceded that Valium, a diazepam, has a stronger and more positive effect on persons ingesting it than does Librium. While Valium has a different chemical formula the differences are not qualitatively significant enough to cause us to conclude that the effects attributed to Valium would be other than of stronger potentialities than those attributed to Librium. We cannot conclude that Valium requires a separate hearing on a new and perhaps more detailed record than that which is presently before us.[13]
 
 II.
 
 48
 This opinion could have been terminated at the conclusion of the previous heading "I." were it not that other points remain for discussion and disposition. Hoffmann asserts that the Director's order was issued without observance of procedure required by law and without due process of law. This brings us to a critical issue in this case, whether the proceedings were "rule making" or "adjudication" as defined, respectively, in 5 U.S.C. Sec. 551(5) or 5 U.S.C. Sec. 551(7). Whether they were rule making or adjudication, the ultimate standard against which we must evaluate the fairness of the proceedings is due process of law. Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129 (1937).
 
 
 49
 (a) Hoffmann contends that the proceedings were essentially adjudicatory and that the participation of the Government's trial counsel in the preparation of the Director's tentative and final orders therefore contravened the separation of functions principle as enunciated by 5 U.S.C. Sec. 554 and violated Hoffmann's right to due process.[14] Section 554(d) contains the following language: "An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision or agency review . . . ." Congress has limited the above restriction to adjudicatory proceedings, see 5 U.S.C. Sec. 554(a), and "[t]he conclusion seems to be rather solid that no law requires the [Director] to separate functions in rule making for which on-the-record hearings are required."[15] The line dividing adjudication and rule making is, unfortunately, not always entirely clear, and this is true in the case at bar. However, consideration of the relevant factors leads us to conclude that the challenged procedures were rule making.
 
 
 50
 Here the final order will apply across the board to all producers, wholesalers, and distributors of Librium and Valium, as well as to pharmacies and physicians. Hoffmann was not singled out for special consideration based on its own peculiar circumstances. The fact that Hoffmann may be one of those adversely affected explains the highly adversary character of the proceeding but does not change the generalized nature of the order. Although the proceeding involved a concrete factual situation from which factual inferences provided the basis for the Director's order, the facts and inferences therefrom were used to formulate a basically legislative-type judgment of entirely prospective application. Compare United States v. Florida East Coast Railway Company, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). Since the proceedings were thus in substance rule making, the separation of prosecuting and decision-making functions was not required. Willapoint Oysters, Inc. v. Ewing, 174 F.2d 676 (9 Cir. 1949).
 
 
 51
 (b) Hoffmann contends that the Director relied on evidence not of record. On November 4, 1969, the day before oral argument was to commence before the Hearing Examiner, the United States Court of Appeals for the Fourth Circuit handed down its decision in Carter-Wallace, Inc. v. Gardner, supra, affirming the Commissioner's use of "substantial potential for significant abuse" in determining whether or not Meprobamate should be listed. At the conclusion of the oral argument, at the Director's order, Government counsel indicated a desire to submit additional evidence covering the three year period from the close of the original hearings, viz., November 18, 1966, to November 4, 1969. The Director requested counsel to attempt to arrive at a stipulation which would simplify any further proceedings. Such a stipulation was agreed to and presented to the Director in the form of a "Joint Recommendation" of counsel.[16]
 
 
 52
 The stipulation recites that four categories of documents which the Government would offer are "substantially similar to evidence previously submitted." The four categories were: "(1) Cases, evidenced by hospital records, medical records and reports, and police records and reports, involving intentional overdoses of Librium or Valium, alone or in conjunction with other drugs, in an apparent attempt at suicide or in a suicidal gesture, (2) A more limited number of cases of the kind described in Category (1), in which death is alleged to have resulted from an intentional overdose of Librium or Valium, most of which also involved simultaneous ingestion of other drugs. (3) Reports of audits of retail drugstores undertaken by Federal or State officials which have shown shortages of Librium or Valium, some of which have resulted in administrative action against the pharmacists involved. (4) Police reports showing instances in which a person arrested for drug violations or for other reasons was found to have Librium or Valium in his possession."
 
 
 53
 The stipulation also provided, "The cases which would be evidenced by these documents appear to be substantially similar to those already in evidence in the prior hearing and do not appear to differ significantly in their nature or frequency of occurrence from those already in evidence. Therefore, this evidence seems cumulative, except to the extent that it indicates that instances of the kind already in evidence have continued to occur since the hearing." The stipulation provided[17] that the documents referred to were not to be put in evidence and that the supplemental hearing was to be limited to the question of the use of Librium and Valium in conjunction with the abuse of other drugs. The documents were not offered and are not of record.
 
 
 54
 Hoffmann asserts that all that is of record is the description of their nature and contents quoted immediately above but that nonetheless the Director's Final Order refers to the Joint Recommendation and states: " 'As a consequence, evidence relating to intentional overdoses and attempted suicides; evidence concerning suicides and other deaths in which the drugs played a significant role; reports of audits of retail drugstores detailing significant shortages which could not be legitimately accounted for; and police reports showing instances in which the drugs were discovered by police during their investigation of drug and other criminal offenses suggesting use and distribution outside of the legitimate channels, were neither to be presented nor rebutted by either side. . . .' (Emphasis added.)"[18] The point made by Hoffmann is that the order, to quote its brief which states the petitioner's position succinctly, "does not disclose how the Director, who is supposed never to have seen them, concluded that these documents showed that the deaths were ones 'in which the drugs played a significant role'; or how he concluded that the audits of retail drugstores showed 'significant shortages which could not be legitimately accounted for'; or how he concluded that possession of the drugs by persons arrested suggested 'use and distribution outside of the legitimate channels'-since such characterizations do not appear in the stipulation.
 
 
 55
 "The comments indicate one of two situations: either the Director read and made an evaluation of the documents, without Roche [Hoffmann] having an opportunity to rebut them or offer evidence as to their significance, or the order was written by the attorneys who had collected the documents for use in their case in behalf of the Government.[19] Neither circumstance is consistent with due process." (Emphasis supplied), citing West Ohio Gas Co. v. Public Utilities Commission of Ohio, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761 (1935); Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio, 301 U.S. 292, 57 S. Ct. 724, 81 L.Ed. 1093 (1937).
 
 
 56
 The point asserted by Hoffmann is without merit. The emphasis put upon the word "significant" in the Director's final order as quoted above is in fact nothing more than an echo, a reverberation of that adjective as used in the Hearing Examiner's Supplemental Report of Findings and Conclusions Re Potential for Abuse of Librium and Valium used Conjunctively with Other Drugs, dated November 6, 1970, Preliminary Statement, "A. Scope of Supplemental Hearing," where the limitations on the scope of the supplemental hearing are given as follows: "The limitations on the scope of the supplemental hearing were in direct response to a joint recommendation made to the Director by counsel for the Government and counsel for Hoffmann-LaRoche, Inc. (Respondent). As indicated in the joint recommendation, the presentation by the Government of other evidence of abuse, together with Respondent's rebuttal evidence, would have inordinately protracted the hearings. Additionally, for the most part, such evidence would have been cumulative; that is, showing a continuation of circumstances existing at the time of the prior hearing in 1966. As a consequence, evidence relating to intentional overdoses and attempted suicides; evidence concerning suicides and other deaths in which the drugs played a significant role; reports of audits of retail drugstores detailing significant shortages which could not be legitimately accounted for; and police reports showing instances in which the drugs were discovered by police during their investigation of drug and other criminal offenses suggesting use and distribution outside of the legitimate channels, were neither presented nor rebutted by either side inasmuch as essentially the same type of evidence had already been adduced at the prior hearing." (Emphasis added.)
 
 
 57
 The comments upon which Hoffmann rests its point included in the Proposed Supplemental Findings of Fact were not objected to in the exhaustive list of exceptions which Hoffmann later filed.[20] Aside from the foregoing, the Director's conclusions to which Hoffmann now objects are amply supported by the stipulation from the evidence of record in the original hearings. See letter of January 7, 1972, from Allan P. Mackinnon, Esquire, attorney for respondents, to Clerk Quinn, at 2.[21]
 
 
 58
 The record therefore does not support Hoffmann's contention that there was a surreptitious display of documents and evidence to the Director by his staff which enabled him to reach the conclusions respecting the three-year period from the close of the original hearing on November 18, 1966 to November 4, 1969, without Hoffmann having an opportunity to rebut the evidence or to offer evidence. And even if the staff attorneys who had collected the documents for use in their case on behalf of the Government had participated in preparing the Director's order, such participation was not improper in connection with the rule making procedures involved here. See subsection (a) of II., supra. Hoffmann cannot support its assertion of lack of due process on these grounds.
 
 
 59
 (c) Hoffmann makes further weighty contentions that the proceedings were conducted without observance of procedure required by law and without due process of law. These contentions must be stated along with what we deem to be the law applicable thereto.
 
 
 60
 As we pointed out in our earlier opinion, Sec. 706(d) (2) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. Sec. 376(d) (2), provides that "any report, recommendations, underlying data, and reasons certified to the Secretary by an advisory committee . . . shall be made a part of the record of any hearing if relevant and material, subject to the provisions of section 7(c) of the Administrative Procedure Act." 464 F.2d 1068, 1069. The casual refusal of the Hearing Examiner to admit this material and the strong objection of the Government to making it part of the record seems without justification and we deem it to be totally unacceptable as a principle of law.
 
 
 61
 The Order, 21 C.F.R., Part 166, commencing the present proceedings regarding Librium and Valium, headed "Depressant and Stimulant Drugs; Proposed listing of Additional Drugs Subject to Control" states: "The Commissioner of Food and Drugs proposes, on the basis of his investigations and recommendations of an advisory committee appointed pursuant to section 511(g) (1) of the Federal Food, Drug, and Cosmetic Act, that the drugs set forth below be listed as depressant or stimulant drugs within the meaning of section 201(v) of the Act. Therefore, pursuant to the provisions of the Federal Food, Drug, and Cosmetic Act (secs. 201(v), 511, 701, 52 Stat. 1055, as amended, 79 Stat. 227 et seq.; 21 U.S.C. 321(v), 360a, 371) and under the authority delegated by the Secretary of Health, Education, and Welfare to the Commissioner (21 CFR 2.90), it is proposed that Part 166 be amended by adding thereto Sec. 166.3 (b) and (c), as follows: Sec. 166.3 Listing of drugs defined in section 201(v) of the act.
 
 
 62
 ******
 
 
 63
 * * *
 
 
 64
 "(c) The Commissioner has investigated and designates all drugs, unless exempted by regulations in this part, containing any amount of the following substances as having a potential for abuse because of their:
 
 
 65
 "(1) Depressant effect on the central nervous system:
 
 
 66
 Established Name Some trade and other names
Chloral hydrate Chloral.
Chlordiazepoxide and its salts Librium.
Diazepam Valium.
Ethchlorvynol Placidyl.
Ethinamate Valmid.
Glutethimide Doriden.
Meprobamate Miltown, Equanil, Meprotabs.
Methyprylon Noludar.
Paraldehyde ----
 
 
 67
 ******
 
 
 68
 * * *
 
 
 69
 "All interested persons are invited to submit their views in writing regarding the proposal published herein."[22] (Emphasis added.)At a pre-hearing conference of August 1, 1966, counsel for the petitioner stated to Examiner Buttle:
 
 
 70
 "Mr. Finney: I called to the attention of the presiding officer that in the order, the original order, listing these drugs, which I believe is the General Exhibit A, the Commissioner of Food and Drug recited as follows: 'The Commissioner of Food and Drugs proposes, on the basis of his investigations and the recommendations of an advisory committee appointed pursuant to section 511(g) (1) of the Federal Food, Drug and Cosmetic Act, that the drugs set forth below be listed as depressant or stimulant drugs within the meaning of Section 201(v) of the act' [sic].
 
 
 71
 "In view of the fact that an advisory committee was utilized in this case under a specific section of the statute and the regulation we would like to move that the presiding officer require the Government to furnish us data as to that advisory committee.
 
 
 72
 "Specifically, we would like to have all the materials, information and data relevant to the listing of Librium and Valium as drugs having a potential for abuse, which was furnished to the advisory committee for its consideration or used by the advisory committee in its deliberations.
 
 
 73
 "Secondly, we would like to have the minutes of the advisory committee's deliberations.
 
 
 74
 "Third, we would like to have a copy of the report of the advisory committee.
 
 
 75
 "Fourth, we would like to have any memoranda or other recommendations from the Bureau of Medicine to the Commissioner relative to the report of the advisory committee or the recommendations of the Bureau as to the reasons for the inclusions of Librium and Valium in the list of drugs having a potential for abuse.
 
 
 76
 "I would point out to the presiding officer that the section of the regulations which deals with the use of an advisory committee makes the delivery of these materials automatic. In the case where the original proposal for a rule comes from a party other than the Commissioner and he then elects to resort to an advisory committee then the regulation is very specific as to copies of all these documents being given to the person requesting them.
 
 
 77
 "In the case of an advisory committee that is appointed by the Commissioner of Food and Drug other than on the request of a party, the same automatic requirement does not exist in the regulations.
 
 
 78
 "However, there is this provision with respect to the Advisory Committee's report and the proper form of the Advisory Committee's report. The regulation states, in Section 166.19(b) (3): 'The [sic] Chairman shall certify to the Commissioner the report and recommendations of the Committee, including any minority report, together with all the underlying data and a statement of the reasons or basis for the recommendations. The report will include copies of all material considered by the Committee except that in the case of scientific literature readily available in scientific libraries proper reference may be made to it instead of furnishing actual copies.'
 
 
 79
 "This is the section that relates to the nature and the form of the Advisory Committee Report which is applicable in any case, whether the appointment of the committee was at the request of a party or at the voluntary election of the Commissioner.
 
 
 80
 "Our reason for requesting that is this: We are seeking and have sought informally, and unsuccessfully, from the Government for some time to get some factual information as to what were the considerations, what were the data, what was the rationale, on which these drugs were included in this list. It appears to us the best and most concise source of that would be, what did the Government deliver to the Advisory Committee, what did the Advisory Committee do about it in their deliberations, and what did they say about it in their report to the Commissioner?
 
 
 81
 "We feel that having elected to use this procedure, and having then elected to go to hearing on our objections we are entitled to have that information."
 
 The following then ensued:
 
 82
 "Examiner Buttle: How about this?
 
 
 83
 "Mr. Phelps [counsel for the respondents]: We strenuously oppose any motion to lay bare the government's files relating to this. I think these data, reports, minutes, and memoranda would be privileged matter. The Commissioner made his finding alone, based on recommendations given to him.
 
 
 84
 "True, he did review these reports.
 
 
 85
 "Examiner Buttle: How about counsel's statement to the effect that they are entitled to them as a matter of course? Is there anything to that?
 
 
 86
 "Mr. Phelps: They are not entitled to them as a matter of course, because it is privileged matter.
 
 
 87
 "Examiner Buttle: Well, I do not see why respondents need them in this instance, because I have indicated that I am going to allow them to offer, and I will receive, evidence in accordance with the theory of their case, which would mean that I will have evidence before me, complete evidence before me, which will involve the respondent's construction of the legislation, and rules issued under it for control.
 
 
 88
 "Since I am receiving such evidence and have indicated on the record that I intend to do so, I see no point in your having this information.
 
 
 89
 "What point is there for it?
 
 
 90
 "I am going to look at your whole case, as a matter of fact, completely in accordance with your theory, completely in accordance with what you say is what Congress meant when it passed the legislation it did pass. So what difference does it make what the Advisory Committee recommended, when now you are adjudicating the matter and we are going to have a complete report in addition to what the Advisory Committee considered? What difference does it make what the Committee or Commissioner considered, insofar as this hearing is concerned?
 
 
 91
 "Mr. Finney: May I inquire whether the Presiding Examiner would feel the same way if we made a second request to be supplied only with a copy of the report of the Advisory Committee?
 
 
 92
 "Examiner Buttle: What about the report of the Advisory Committee?
 
 
 93
 "Mr. Phelps: We would oppose that also. I would have to look at that myself. I do not recall it, exactly.
 
 
 94
 "Examiner Buttle: Would you look into it?
 
 
 95
 "Mr. Phelps: I will.
 
 
 96
 "Examiner Buttle: If you feel free to do it voluntarily, I am anxious that you be as cooperative as you can.
 
 
 97
 "Mr. Phelps: Yes, sir.
 
 
 98
 "Examiner Buttle: But I am afraid if we get into all the underlying data with regard to what the Advisory Committee considered it will merely confuse the issues that I'm going to consider.
 
 
 99
 "I am allowing you to adduce the entire theory of your case. I think it is only fair that I should. I do not see how those documents are necessary. But they can look at the report, and perhaps you can get together on that.
 
 
 100
 "Mr. Phelps: That could be one of the things we will discuss with them when we get together.
 
 
 101
 "Examiner Buttle: Yes. Discuss that between now and Friday.
 
 
 102
 "So your application is denied in that respect, for the reasons I indicated.
 
 
 103
 "Mr. Finney: Just in order that neither the Presiding Officer nor the Government's counsel be under any misapprehension in this matter, because I do not want to induce their cooperation on the basis of any misunderstanding of our feeling about it, I would like to advise the Government and the Presiding Officer at this time that-based on what investigation we can make, we think in this case the Government purported to use an Advisory Committee and totally departed from its own regulations as to how that Advisory Committee should function, and the kind of documents that that Advisory Committee would provide to the Government."[23]
 
 
 104
 There is nothing in the record to suggest that Hearing Examiner Buttle examined the Shideman report or its underlying exhibits. In fact, a fair reading of the colloquy between him and counsel indicates that he did not read or examine the report and its underlying material.
 
 
 105
 Two statutes are involved.
 
 
 106
 21 U.S.C. Sec. 874 provides: "The Attorney General may from time to time appoint committees to advise him with respect to preventing and controlling the abuse of controlled substances. . . ."[24]
 
 
 107
 21 U.S.C. Sec. 376(d) (2) provides: "[A]ny report, recommendations, underlying data, and reasons certified to the Secretary by an advisory committee appointed pursuant to subparagraph (D) of the subsection (b) (5) of this section, shall be made a part of the record of any hearing if relevant and material, subject to the provisions of section 1006(c) of Title 5. The advisory committee shall designate a member to appear and testify at any such hearing with respect to the report and recommendations of such committee upon request of the Secretary, the petitioner, or the officer conducting the hearing, but this shall not preclude any other member of the advisory committee from appearing and testifying at such hearing; . . ."
 
 
 108
 Despite the express provisions of the statutes referred to, the Hearing Examiner, counsel for the Department objecting to the admission of the report and its underlying material, refused to have them produced for the examination of the petitioner, first on the ground that the material was "confidential" and later on the ground that production would be useless. At long last, on July 10, 1972, pursuant to our direction, the report was produced and is attached to this opinion as Appendix "B". The report in substance is merely a recommendation that certain drugs, including Librium and Valium, should be included in "the regulations implementing the drug abuse law" because, allegedly they have a "potential for abuse because of their depressant effect on the central nervous system . . ." Without the underlying material the report was informationally useless and the original material apparently was lost. However, to make a long and tortuous story short,[25] the underlying material of the Shideman report has now been made available and stipulated into this record for the sole purpose of determining whether Hoffmann was prejudiced by the failure of the Hearing Examiner to permit examination of the report and the underlying material on August 1, 1966. This issue has been briefed and the last memorandum, that of the respondents, was filed in this court on January 2, 1973. We are, therefore, able at long last to dispose of this case.
 
 
 109
 Hoffmann is very critical of the Shideman report and its underlying data, but nonetheless Hoffmann's memorandum of December 12, 1972, respecting the report goes far afield. On the other hand, we must confess ourselves surprised as does Hoffmann by the paucity of supporting material for the report.[26] It is also the case that the seven-man advisory committee met for only two days and considered Librium and Valium among many other drugs as hereinbefore set out in this opinion. See Order, 21 C.F.R., Part 166, supra. The minutes of the meetings are indeed scanty and the material submitted by the Executive Secretary, Dr. Cyrus H. Maxwell, of the FDA staff, which contains "background material" has little bearing on whether or not Librium or Valium should be listed. The first memorandum from Dr. Maxwell also submitted an agenda for the committee's scheduled two-day meeting on December 27-28, 1965, and the data on individual drugs submitted to the committee for its consideration were contained in five exhibits attached to this agenda and dealt briefly with each drug to be considered by the committee. A subsequent memorandum dated December 13, 1965, from Dr. Maxwell distributed to the committee an index to three of these exhibits and brief supplements to two of them, together with the FDA's data on the drugs to be considered.[27] The minutes do not disclose the amount of time which was devoted by the committee to the consideration of each individual drug. Hoffmann insists that it is "obvious that the committee could not have devoted more than minutes to the discussion of each of the 18 drugs which they recommended be regulated, the 8 drugs which they recommended not be regulated, and the 30 drugs which they apparently considered but on which they deferred decision and asked for further information."[28] The committee's report consists of a one-page memorandum, a copy of which accompanies this opinion and is marked Appendix "B".
 
 
 110
 These criticisms, however, are beside the point for it was not incumbent upon the Commissioner even to have appointed a committee or that the form of its report should be perfect. However, having embarked upon the report its contents are material insofar as their non-disclosure affected the fairness of the hearing and prejudiced Hoffmann's case. In this connection, some very troublesome items appear. There were three documents in the report which, if they had been put before the Hearing Examiner and developed fully (and surely Hoffmann would have called the Examiner's attention most vigorously to them) might have persuaded the Examiner to recommend that the drugs not be listed, thereby affecting the final order of the Director. The facts concerning the first of these are as follows: A senior member of FDA's Medical Staff, Dr. Dorothy S. Dobbs, submitted a report to the advisory committee dated August 9, 1965, concerning Librium. In the final paragraph of her report, Dr. Dobbs stated: "It is my conclusion, however, based entirely on the information described above, that evidence of abuse of this drug is minimal. It is equally clear that information from other sources may be quite different."[29] Surely Dr. Dobbs would have been an excellent witness for Hoffmann in the proceedings and we cannot assume Hoffmann would not have called her to testify in respect to her "minimal" conclusion. It would have been possible to show, according to Hoffmann, that Dr. Dobbs reviewed the volumes of "NDA 12-249", the drug application filed covering Librium, and the "130.35B Report" as to adverse reactions of Librium. These documents could have enhanced the weight of her testimony but we do not have them before us. Dr. Dobbs was not called as a witness. Had Hoffmann known of her report and its conclusion so favorable to Hoffmann, one might well conclude that petitioner would have called her as a witness. The second item relates to the memorandum of Dr. N. N. Alberstadt of November 22, 1965, concerning Valium. This was addressed to Mr. Julius Hauser, Executive Officer, and is as follows: "The evidence gathered from the scientific literature and from reports recently submitted by the field districts is not sufficient to support a finding that diazepam has a potential for abuse because of its depressant effect on the central nervous system. Additional evidence may accrue in the future, however, so that such a finding can be supported." What we have said about Dr. Dobbs' report is equally applicable to that of Dr. Alberstadt. Had Hoffmann known of Dr. Alberstadt's report and its conclusions favorable to Hoffmann, one might well conclude that Hoffmann would have called him as a witness. It should be pointed out that Dr. Alberstadt had the final responsibility for making the recommendation of the Division of Medical Review to the Medical Director and had access to all of the reports which had been collected by the Bureau of Medicine from FDA Field Offices. Certainly Hoffmann was entitled to have explored Dr. Alberstadt's conclusions, and the basis for those conclusions. Third, and this seems to us to be of particular importance, the Medical Director, Dr. Joseph F. Sadusk, Director of the Bureau of Medicine, in a memorandum dated November 29, 1965, addressed to the Commissioner respecting the Drug Abuse Control Amendments of 1965, did not include Valium among the drugs that should be listed albeit he did include Librium. Dr. Sadusk's memorandum and its contents were of course, not known to Hoffmann, and again, Dr. Sadusk would have been an excellent witness for the petitioner.
 
 
 111
 Our next reference must be to the Shannon and Yolles reports, Dr. James A. Shannon, Director of National Institute of Health, addressed to the Surgeon General, Public Health Service, a report dated July 1, 1965, which listed "a number of agents which [our staff] believe should be considered by the FDA for the list of drugs to be controlled."[30] There was also a memorandum from Dr. Stanley F. Yolles, Director of the National Institute of Mental Health, addressed to the Surgeon General, dated July 25, 1965, elaborating on the basis for recommending consideration of particular drugs.[31] They are set out in the footnotes. Respecting the Shannon and Yolles reports, Hoffmann states in its final memorandum: "Perhaps the most significant documents from the standpoint of Petitioner's ability to prepare its own case, as well as to conduct effective cross-examination, in the administrative hearing were two internal memoranda of the Public Health Service which were forwarded to the FDA by the Surgeon General and furnished to the Advisory Committee as Exhibit E to the agenda. The first was a memorandum from Dr. James A. Shannon, the Director of the National Institute of Health, to the Surgeon General, dated July 1, 1965, listing 'a number of agents which [our staff believes] should be considered by the FDA for the list of drugs to be controlled.' The second was a memorandum from Dr. Stanley F. Yolles, the Director of the National Institute of Mental Health, to the Surgeon General, dated July 25, 1965, elaborating on the basis for recommending consideration of particular drugs. These memoranda would have alerted Petitioner to the theory upon which the Government later contended that Librium and Valium had a potential for abuse-a theory which, because these documents were not available, Petitioner was able to divine only after the hearing. In fact, the theory was not coherently stated until the testimony of Dr. Harris Isbell, the Government's twenty-fifth witness, who was not called until August 29, 1966, and was not fully developed until the testimony of Dr. Edward F. Domino, the Government's rebuttal witness, who was not called until October 26, 1966, after Petitioner had completed its case. Dr. Shannon's memorandum indicated the criteria which NIH had used in suggesting drugs to be considered for listing. It stated: 'Our nominations . . . fulfill one or more of the following criteria: (1) Clinical evidence of compulsive use; (2) evidence that physical dependence will develop with chronic use; and (3) evidence that the agent has a basic mode of action that is similar, if not identical, to agents that have been clearly demonstrated to produce physical dependence.' "
 
 
 112
 Hoffmann's brief goes on to assert: "Knowing that there was no clinical evidence of compulsive use, and that the basic mode of action of Librium and Valium had been scientifically demonstrated to be quite different from those agents which had been abused, Petitioner's cross-examinations and preparations would have been immediately focused on the apparent belief that physical dependence on these drugs 'will develop with chronic use.' For example, since the only instances of physical dependence on Librium were the patients in Dr. Hollister's experiment, Petitioner would have been better able to develop by cross-examination and direct evidence the lack of relevance of this experiment to an assessment of abuse potential. That it could have done so in the original hearing is best illustrated by Dr. Hollister's own testimony in the supplemental hearing.
 
 
 113
 "Equally useful in anticipating the Government's theory and preparing Petitioner's case would have been the memorandum of Dr. Yolles. It would have given Petitioner its first notice, prior to Dr. Deneau's appearance as a witness, that the Government would argue for the listing of 'all [sedative compounds] which have been shown by Dr. Gerald Deneau . . . to effectively replace barbiturates and prevent withdrawal symptoms in dogs made physiologically dependent upon barbiturates.' It also would have provided the conclusive rebuttal to the use of this standard, because the memorandum points out that other sedatives not proposed for control could also be expected to suppress the barbiturate abstinence syndrome, 'since bromides are the only non-phenothiazine sedatives tested, to date, which have failed to suppress this syndrome.' Since this test would result in regulation of practically all sedatives, it runs directly counter to the intention of the Drug Abuse Amendments, as clearly expressed by Commissioner Larrick in his testimony before the House committee: 'Not every drug that would affect the central nervous system [e. g., every sedative] would come under this bill. It would have to not only affect the nervous system, but be a drug that is sought for non-medical purposes to produce these escapes from reality.' "[32] (Star note omitted).
 
 
 114
 An examination of the record shows that Hoffmann makes some rather extravagant claims as to the assistance which the possession of the reports of Drs. Shannon and Yolles would have afforded it, but without burdening this already over-long opinion with the details of these claims it is sufficient to say that in our view Hoffmann would have been assisted in the preparation of its case had these reports been before it.
 
 
 115
 As to what effect the inclusion of this report and its supporting material would have had upon the Hearing Examiner and the Director in the formulation of his Final Order, one can only surmise. It seems clear from the record that the report and its material were never examined by the Hearing Examiner or by the Director. Some of its contents were potently in favor of Hoffmann's position and there can be no doubt that there would have been substantial assistance to Hoffmann in the preparation of its case had the entire Shideman report and its underlying documents been made available to it when requested at the pre-trial proceeding. Accordingly, we deem the nondisclosure to be so egregious as to have tainted the entire procedure.
 
 
 116
 As we said in our previous opinion, 464 F.2d at 1072, "The objection of Hoffmann goes to the fairness of the hearing, and it should be noted that the denial of somewhat analogous reports have been treated as a lack of procedural due process even where the reports have not been mandatorily required by statute." In support of our position we cited Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955); United States v. Cabbage, 430 F.2d 1037 (6 Cir. 1970); and United States v. Owen, 415 F.2d 383 (8 Cir. 1969).
 
 
 117
 The listing action set out in the Director's Final Order will be vacated and set aside.[33]APPENDIX "A"
 
 
 118
 CHRONOLOGY OF PERTINENT EVENTS RELATING TO PROCEEDINGS TO DESIGNATE LIBRIUM AND VALIUM AS DRUGS SUBJECT TO CONTROL
 
 
 119
 July 15, 1965-Drug Abuse Control Amendments of 1965 enacted into law. [Act of July 15, 1965, Pub.L. No. 89-74, 79 Stat. 226]
 
 
 120
 January 18, 1966-Commissioner of Food and Drugs published in the Federal Register a proposal to amend Part 166 of the regulations [21 C.F. R. Part 166] under the Federal Food, Drug, and Cosmetic Act by listing Librium and Valium under Section 166.3(c)(1) as "depressant or stimulant" drugs having a potential for abuse because of their depressant effect on the central nervous system. [31 Fed.Reg. 565]
 
 
 121
 January 27, 1966-Commissioner published in the Federal Register a final order amending regulations under the Act to add a new Part 166 dealing with depressant and stimulant drugs and containing basic definitions and interpretive regulations. [31 Fed. Reg. 1071]
 
 
 122
 February 17, 1966-Respondent Hoffmann-LaRoche Inc. (hereinafter "Roche"), manufacturer and distributor of Librium and Valium, submitted its comments on the proposed listing of the two drugs.
 
 
 123
 March 19, 1966-Commissioner published in the Federal Register the order proposed on January 18, 1966, and provided that persons adversely affected might file written objections within thirty days. [31 Fed.Reg. 5679]
 
 
 124
 April 18, 1966-Roche filed timely objections to the order of March 19, 1966, asserting that the listing of the two drugs was not justified on the basis of experience and would be contrary to the public interest.
 
 
 125
 May 17, 1966-Commissioner published in the Federal Register an order and notice stating the effectiveness of the prior order with respect to Librium and Valium, finding that Roche's objections stated reasonable grounds for a hearing, specifying the issues, and setting the matter for hearing. [31 Fed.Reg. 7174]
 
 
 126
 July 19, 1966-Commissioner published in the Federal Register an order and notice designating a new Hearing Examiner. [31 Fed.Reg. 9725]
 
 
 127
 August 1, 1966-Pre-hearing conference held.
 
 
 128
 August 5, 1966-Second pre-hearing conference held.
 
 
 129
 August 8 to November 18, 1966-Hearings and conferences held. [During this period there were forty-five days of hearings and conferences, the transcript of which covers 5,090 pages; thirty-four witnesses were called and forty-six articles or extracts from the medical literature were introduced by the Government; forty-three witnesses were called and fifty-five articles or extracts from the medical literature were introduced by the Respondent.]
 
 
 130
 January 31, 1967-Roche submitted Respondent's Proposed Findings of Fact and Proposed Conclusions of Law, accompanied by a Brief of Respondent in Support of Proposed Findings of Fact and Proposed Conclusions of Law.
 
 
 131
 February 9, 1967-Roche submitted Respondent's Supplemental Brief in Reply.
 
 
 132
 February 28, 1967-Oral argument held before Hearing Examiner.
 
 
 133
 April 7, 1967-Hearing Examiner issued Report Including Recommended Findings and Conclusions.
 
 
 134
 April 20, 1967-Roche filed Motion to Disqualify Assistant General Counsel, Food and Drug Division, U. S. Department of Health, Education, and Welfare, seeking to prevent said counsel from participating or advising in the formulation of any tentative order, or in the decision on any motion in the case.April 28, 1967-Commissioner denied motion filed on April 20, 1967.
 
 
 135
 May 4, 1967-Commissioner transmitted by letter to Roche the order denying the motion filed on April 28, 1967.
 
 
 136
 December 6, 1967-Commissioner published in the Federal Register a final order listing Meprobamate as a drug subject to control. [32 Fed.Reg. 17473]
 
 
 137
 February 7, 1968-President of the United States submitted to Congress Reorganization Plan No. 1 of 1968, transferring to the Department of Justice the functions of the Bureau of Narcotics and the Bureau of Drug Abuse Control. [33 Fed.Reg. 5611]
 
 
 138
 April 3, 1968-Conference held between Commissioner and attorney for Roche.
 
 
 139
 April 8, 1968-Reorganization Plan No. 1 of 1968 became effective.
 
 
 140
 May 21, 1969-Director of the Bureau of Narcotics and Dangerous Drugs, U. S. Department of Justice, published in the Federal Register his Proposed Findings of Fact and Conclusions and Tentative Order, proposing to list Librium and Valium as drugs subject to control. [34 Fed.Reg. 7968]
 
 
 141
 August 19, 1969-Roche filed Exceptions and Brief of Respondent, relating to the proposed order of May 21, 1969.
 
 
 142
 October 28, 1969-Director published in the Federal Register a Notice of Oral Argument on Exceptions to Tentative Order Placing Librium and Valium under Control.
 
 
 143
 November 4, 1969-United States Court of Appeals for the Fourth Circuit issued its decision in Carter-Wallace, Inc. v. Gardner, 417 F.2d 1086 (4th Cir. 1969).
 
 
 144
 November 5, 1969-Oral argument held before Director.
 
 
 145
 February 27, 1970-Further conference held before Director.
 
 
 146
 April 1, 1970-Counsel signed Joint Recommendation of the Bureau of Narcotics and Dangerous Drugs and Hoffmann-LaRoche Inc., in the Matter of Listing Librium and Valium as Drugs Subject to Control.
 
 
 147
 April 8, 1970-Director published in the Federal Register a Notice of Supplemental Hearing, announcing that the hearing was to receive evidence bearing on the use of Librium and Valium in conjunction with, or related to, the abuse of other drugs, including rebuttal evidence from Roche. [35 Fed. Reg. 5695]
 
 
 148
 April 13, 1970-Pre-hearing conference held.
 
 
 149
 April 22, to June 15, 1970-Supplemental hearings and Conferences held [During this period there were fourteen days of hearings and conferences, the transcript of which covers 938 pages; six witnesses were called by the Government; eighteen witnesses were called and four articles from the medical literature were introduced by the Respondent.]
 
 
 150
 July 6, 1970-Post-hearing conference held.
 
 
 151
 September 11, 1970-Roche submitted Supplemental Brief of Respondent, accompanied by Respondent's Proposed Supplemental Findings of Fact and Proposed Conclusions of Law.
 
 
 152
 September 21, 22, and 28, 1970-Oral arguments held before Hearing Examiner on proposed findings of fact.
 
 
 153
 October 27, 1970-Comprehensive Drug Abuse Prevention and Control Act of 1970 enacted into law. [Act of October 27, 1970, Pub.L.No. 91-513, 84 Stat. 1236]
 
 
 154
 November 6, 1970-Hearing Examiner submitted his Supplemental Report of Findings and Conclusions Re Potential for Abuse of Librium and Valium Used Conjunctively with Other Drugs.
 
 
 155
 November 9, 1970-Roche filed Motion to Disqualify Counsel, Bureau of Narcotics and Dangerous Drugs, seeking to prevent said counsel from participating or advising in the formulation of any tentative order, or in the decision on any motion, in this case.November 17, 1970-Director denied motion filed on November 9, 1970.
 
 
 156
 November 24, 1970-Director published in the Federal Register his Proposed Supplemental Findings of Fact, relating to alleged use of Librium or Valium in conjunction with, or related to, the abuse of other drugs. [35 Fed. Reg. 17998]
 
 
 157
 January 6, 1971-Roche filed Exceptions of Respondent to Proposed Supplemental Findings of Fact, including request for oral argument before the Director.
 
 
 158
 January 13, 1970-Acting Director denied request for oral argument filed on January 6, 1971.
 
 
 159
 February 6, 1971-Director published in the Federal Register a Final Order, Findings of Fact and Conclusions of Law, to become effective on May 7, 1971, listing Librium and Valium as drugs subject to control. [36 Fed. Reg. 2555]
 
 
 160
 APPENDIX "B"
 
 UNITED STATES GOVERNMENT
 Memorandum
 
 161
 TO: DR. JOSEPH F. SADUSK,
 
 JR. MEDICAL DIRECTOR
 
 162
 FROM: Dr. Frederick F. Shideman,
 
 Chairman Advisory Committee
 SUBJECT: Abuse of Depressant and
 Stimulant Drugs
 
 163
 After due deliberation it is the unanimous opinion of this committee that there is sufficient evidence at this time to support a finding of "potential for abuse" with respect to the drugs listed below. Accordingly, it is our recommendation that such drugs be included in the regulations implementing the drug abuse law.
 
 
 164
 I. Drugs having a potential for abuse because of their depressant effect on the central nervous system:
 
 
 165
 glutethimide (Doriden)
 
 
 166
 chlordiazepoxide (Librium)
 
 
 167
 meprobamate (Miltown, Equanil, etc.)
 
 
 168
 ethchlorvynol (Placidyl)
 
 
 169
 chloral hydrate
 
 
 170
 diazepam (Valium)
 
 
 171
 ethinamate (Valmid)
 
 
 172
 methyprylon (Noludar)
 
 
 173
 paraldehyde
 
 
 174
 II. Drugs having a potential for abuse because of their stimulant effect on the central nervous system. In addition, these drugs may also be designated as habit forming because of their stimulant effect on the central nervous system.
 
 
 175
 "d" and "d1" methamphetamine hydrochloride
 
 
 176
 phenmetrazine hydrochlorade (Preludin)
 
 
 177
 III. Drugs having a potential for abuse because of their hallucinatory effect:
 
 
 178
 d-lysergic acid diethylamide
 
 
 179
 (LSD-25)
 
 
 180
 peyote
 
 
 181
 dimethyltryptamine (DMI)
 
 
 182
 psilocyn
 
 
 183
 psilocybin
 
 DEPARTMENT OF HEALTH, EDUCATION AND WELFARE
 Exhibit No ____________________
 Hearing _________________________
 Offered by: ____________________
 Date _________________________
 Reporter _______________________
 
 184
 We reproduce the Memorandum in the form in which it was submitted to us. There are imperfections in the Memorandum but we think that it is sufficiently clear to demonstrate the report of which it is a copy.
 
 
 
 [1]
 Cited in Hoffmann's Appendix, Vol. I, at 391 as "February 6, 1971" and "35 Fed. Reg."
 
 
 [2]
 Section 201(v) of the 1965 Amendments, 21 U.S.C. Sec. 321(v) (1965), provided in part as follows: "The term 'depressant or stimulant drug' means-(1) any drug which contains any quantity of (A) barbituric acid * * *; (2) any drug which contains any quantity of (A) amphetamine * * *; (3) any drug which contains any quantity of a substance which the Secretary, after investigation, has found to have, and by regulation designates as having, a potential for abuse because of its depressant or stimulant effect on the central nervous system * * *"
 The provisions of the 1970 Act are not markedly different in respect to the issues before us from the 1965 Act. Section 102 (9)(D) defines a depressant or stimulant drug as: "any drug which contains any quantity of a substance which the Attorney General, after investigation, has found to have, and by regulation designated as having, a potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect." 21 U.S.C. Sec. 802(9)(D)(1970).
 
 
 [3]
 See Sec. 702(c) of P.L. 91-513, Title II, Oct. 27, 1970, 84 Stat. 1283 (21 U.S.C. Sec. 321 NOTE (1970)) which provides: "All administrative proceedings pending before the Bureau of Narcotics and Dangerous Drugs on the date of enactment of this Act shall be continued and brought to final determination in accord with laws and regulations in effect prior to such date of enactment. Where a drug is finally determined . . . to be depressant [drug] . . . such drug shall automatically be controlled under this title by the Attorney General without further proceedings and listed in the appropriate schedule after he has obtained the recommendation of the Secretary [Health, Education and Welfare]." (Emphasis added). The Secretary has recommended that Librium and Valium be placed on Schedule IV of 21 U.S.C. Sec. 812
 
 
 [4]
 See H.R.Rep.No.130, 89th Cong., 1st Sess. 13 (1965), stating in part: "The committee considered the advisability of specifically designating meprobamate, glutethimide, ethinamate, ethchlorvynol, methyprylon, and chlordiazepoxide as 'depressant or stimulant drugs.' It was decided that this should not be done because the Secretary of Health, Education, and Welfare will, under the provisions of proposed section 201(v) (3) of the Federal Food, Drug, and Cosmetic Act, consider designating these drugs as 'depressant or stimulant drugs' and that it would be inadvisable to single out these drugs while leaving out others having substantially similar abuse potentials. The committee expects the Secretary to take early action with respect to the consideration of the listing of these six drugs. (Emphasis added)
 
 
 [5]
 Cited in Hoffmann's appendices as "January 18, 1966."
 
 
 [6]
 Cited in Hoffmann's appendices as "May 17, 1966."
 
 
 [7]
 See note 1, supra
 
 
 [8]
 Order of April 20, 1971
 
 
 [9]
 The record in this case is large. Without counting exhibits the record exceeds 10,000 pages, much of which is printed. The exhibits contain several hundred printed pages. The task of examining this very large record has been made more difficult by the fact that many of the references in Hoffmann's brief have been paginated to the transcripts, not paginated to the appendices, which consist of four large volumes, not counting a large volume of exhibits, and other pertinent materials
 
 
 [10]
 Note 7, which immediately follows the word "community" in Judge Butzner's opinion, refers again to the Final Report of the President's Advisory Commission on Narcotics and Drug Abuse
 
 
 [11]
 36 Fed.Reg. 2555, 2560-61 (1971)
 
 
 [12]
 36 Fed.Reg., at 2555-56
 
 
 [13]
 Findings 34 and 35, 36 Fed.Reg., at 2558, we believe may be deemed to be generally illustrative of the close relationship of the effects of the respective drugs:
 "34. Dr. John G. Lofft, a psychiatrist and specialist in the treatment of alcoholism and allied addictions, testified that the abstinence syndrome associated with Librium and Valium withdrawal compares to that experienced after abrupt withdrawal from barbiturates (Tr. 550). It is characterized in its mildest form by insomnia and increased anxiety (Tr. 548-49). When the patient has been taking elevated doses for long periods of time the withdrawal syndrome is marked by restlessness, tremulousness, muscle pains, perspiration, hallucinations, and sometimes, although not frequently, convulsive seizures (Tr. 540, 543, 547). The severity of the withdrawal is dependent upon the degree of dependence, and the amount of drug the person has been taking (Tr. 551-52; Jaffe (1965), R-133, p. 289). Librium-Valium withdrawal differs from the barbiturate withdrawal syndrome in that it persists over a longer period of time (Lofft, Tr. 550-51).
 "35. The evidence also indicates that those individuals who showed signs of Librium or Valium dependence usually had experienced difficulty with similar drugs before-most often alcohol (Lofft, Tr. 553; Evans, Tr. 820; Uzee, Tr. 905; Chambers, Tr. 1626-29; Chelton, Tr. 1670, 1674). These 'dependent personalities', as they have been characterized, look for chemical solutions to a variety of problems. They will reduce a dependency on alcohol by moving to a different but related dependency (Lofft, Tr. 552-53). Sometimes the pattern of dependency is multiple in nature, e. g., Librium and alcohol together, Librium and a barbiturate, etc. (Lofft, Tr. 536; Evans, Tr. 819-20; Uzee, Tr. 907; Isbell, Tr. 1558; Chambers, Tr. 1632; Chelton, Tr. 1671; Williams, Tr. 1741)."
 See further Findings of Fact 59 to 63, inclusive, 36 Fed.Reg., at 2560.
 See also Conclusions of Law 5 to 7, inclusive, 36 Fed.Reg., at 2561.
 
 
 [14]
 The proceedings were conducted on behalf of the Bureau by three attorneys, one of which was the Chief Deputy Counsel and the other two were of the Staff of the Chief Counsel. Hoffmann moved to disqualify these attorneys on November 9, 1970, seeking to prevent them from participating or advising the formulation of any tentative order or in the decision of any motions. See Appendix to Petitioner's brief at 293. The Director denied this request and the counsel named in the brief continued in the case. Attached to this opinion as Appendix "A" is a chronology of the pertinent events relating to the proceedings at bar which may be of help in understanding what was before the Bureau and is now before this court
 
 
 [15]
 Davis, Administrative Law Treatise, 1970 Supplement, p. 443
 
 
 [16]
 The "Joint Recommendation" is in effect a stipulation and is binding on both the parties and the Commissioner. Hackfeld & Co. v. United States, 197 U.S. 442, 25 S.Ct. 456, 49 L.Ed. 826 (1905); Osborne v. United States, 351 F.2d 111 (8 Cir. 1965); Burstein v. United States, 232 F.2d 19 (8 Cir. 1956); United States v. Kahriger, 210 F.2d 565 (3 Cir. 1954)
 
 
 [17]
 The word used in the Petitioner's brief is "recommended" but it is the understanding of the court that the Joint Recommendation is in law a stipulation which was binding upon the parties and upon the Director
 
 
 [18]
 Appendix, Vol. I, pp. 391-392
 
 
 [19]
 Petitioner's Brief, p. 97
 
 
 [20]
 Appendix, Vol. I, 309, 310, 318-387
 
 
 [21]
 ". . . [S]pecifically this evidence is as follows:
 Conclusions (a): Evidence concerning suicides and other deaths in which the drugs played a significant role-
 Reference: Finding 51 (App. I p. 407)
 Spellman Tr. 634-685
 Snoddy Tr. 1132-1140
 G-99(a-jj), G-121, G-150, G-157
 G-170, G-183, G-190, G-221(a)-(i)
 G-225B(10), G-226B(1), (2), (3),
 (4) G-241 (G-99v), G-261 (1 case)
 G-288 (G-99-S), G-289 (G-99E)
 G-290
 Conclusions (b): Reports of audits of retail drugstores detailing significant shortages which could not be legitimately accounted for-
 Reference: Findings 40, 41 (App. I p. 404)
 Clevenger Tr. 1796-1863
 Ashcraft Tr. 1157-1158, 1517-1519
 Witness "X" Tr. 1895-1897
 G-268
 Conclusions (c): Police reports showing instances in which the drugs were discovered by police during their investigation of drug and other offenses suggesting use and distribution outside of the legitimate channels-
 Reference: Finding 45 (App. I p. 405)
 Bonder Tr. 754-771, 794-796
 Conen, Sheldon Tr. 880-897
 G-101, G-112, G-113, G-178, G-193,
 G-265, G-266, G-270, G-271, G-272"
 
 
 [22]
 It is probable that the inquiry into Librium and Valium was inspired, as also was that into Meprobamate and certain other drugs, by Congress. See Finding of Fact No. 63 of the Final Order of the Director as follows: "The legislative history of the Amendments reflects the expectations of Congress, in enacting this legislation, that Librium and similar tranquilizing drugs, would be expeditiously brought under the control of the Amendments because of their potential for abuse. Testimony taken before the House Committee on Interstate and Foreign Commerce demonstrated the need for bringing Librium under these controls. (House Report No. 130, 89th Congress) This Committee considered the advisability of listing chlordiazepoxide (Librium) among others by name, but decided not to single out this or any other drug. The Committee, however, stated that it expected the Secretary of Health, Education, and Welfare to take early action with respect to the consideration of bringing Librium and other drugs within the controls of the Amendments. A similar expectation was expressed by the Senate Committee on Labor and Public Welfare. (Senate Report No. 337, 89th Congress) (G-228, pp. 2-3; G-229, p. 13; G-230, pp. 24, 33, 38, 43-53, 54-56, 91-92, 101-105, 115-121)." 36 Fed.Reg., at 2560
 We cannot agree, however, with Hoffmann's contention that the Congressional Report influenced the Director's decision. Congress suggested an inquiry which the Bureau of Narcotics and Dangerous Drugs made in due course and by accustomed procedure.
 
 
 [23]
 Tr. 64-71
 
 
 [24]
 This section is referred to in the answer of the respondents to our order to show cause of March 17, 1972 as to why the report, recommendations and underlying data and reasons certified to the Secretary by the advisory committee should not be made available to the petitioner for examination by it, as 21 U.S.C. Sec. 360a(g) (1). It is presently set out in the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. Sec. 874
 
 
 [25]
 In this connection we refer to our Per Curiam opinion in Hoffman-LaRoche, Inc. v. Kleindienst et al., 464 F.2d 1068 (3 Cir. 1972). We in effect ordered production of the report and its underlying material. Cf. Environmental Protection Agency, et al., v. Mink et al., 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). Indeed, the right to examine statements which might have been false or twisted such as an investigator's testimony is material and is not privileged. See N.L.R.B. v. Capitol Fish Co., 294 F.2d 868, 872 (5 Cir. 1961). In fact, the respondents do not assert privilege in this court
 A photostatic copy of the report was finally found and is attached to this opinion as Appendix "B". The report is addressed to Dr. Joseph F. Sadusk, Medical Director, from Dr. Frederick E. Shideman, Chairman, Advisory Committee. The underlying material contained in the Joint Supplemental Appendix filed November 29, 1972 was procured from a member of the advisory committee who had retained possession of the supporting documents.
 
 
 [26]
 In our previous opinion, 464 F.2d 1068, 1073, we stated: "We do not know, of course, the length of the report of the advisory committee or the amount of data upon which it was based, but we think we can safely assume that it was not inconsiderable." Our assumption apparently was incorrect
 
 
 [27]
 Supp.Appendix, at 36
 
 
 [28]
 See Supp.Appendix, at 45-58
 
 
 [29]
 There was information from other sources. See this opinion under heading "I."
 
 
 [30]
 
 UNITED STATES GOVERNMENT
 Memorandum
 Date: July 1, 1965
 To: Surgeon General, PHS
 From: Director, NIH
 Subject: Drug Abuse Control Amendments of 1965
 In reference to your memorandum on the same subject to the Bureau Chiefs, dated June 7, members of our staff have identified a number of agents which they believe should be considered by the FDA for the list of drugs to be controlled.
 We have applied the following criteria for drugs with amphetamine-like action to be listed under Section 201(v)(2): (1) Evidence that the drug has been used compulsively; (2) the drug produces sensation and feelings of wellbeing; and (3) chronic abuse of the agent can produce a toxic psychosis. The following agents fulfill one or more of these criteria:
 diethylpropion (Tenuate)
 methentermine (Wyamine)
 methylphenidate (Ritalin)
 phenmetrazine (Preludin)
 pipradrol (Meratran)
 Our nominations for inclusion under Section 201(v)(3) are listed below and fulfill one or more of the following criteria: (1) Clinical evidence of compulsive use; (2) evidence that physical dependence will develop with chronic use; and (3) evidence that the agent has a basic mode of action that is similar, if not identical, to agents that have been clearly demonstrated to produce physical dependence.
 carisoprodol (Soma)
 chlordiazepoxide (Librium)
 diazopam [sic] (Valium)
 ethchlorvynol (Placidyl)
 ethinamate (Valmid)
 glutethimide (Doriden)
 meprobamate (Miltown, Equanil, Meprospan, Meprotabs)
 methyprylon (Noludar)
 We also expect that LSD-25, psilocin, and mescaline will be included on the list of drugs to be regulated. We hope that Papaverine will be exempted from regulation.
 Attached is a memorandum from the Director of NIMH setting forth a thoughtful consideration of this problem.
 /s/ J. A. SHANNON
 James A. Shannon, M.D.
 Attachment
 
 
 [31]
 
 UNITED STATES GOVERNMENT
 Memorandum
 Date: June 25, 1965
 To: The Surgeon General
 Through: Director, NIH
 From: Director, National Institute of Mental Health, NIH
 Subject: Drugs to be included under the Drug Abuse Amendments of 1965
 I have reviewed the Drug Abuse Control Amendments and Commissioner Larrick's memorandum to you of May 26, 1965. Before giving a list of drugs, I would like to make a few comments about a central issue in all this, namely the definition of "potential for abuse." If one assumes that all agents with pharmacological actions similar to those of the barbiturates and amphetamines have a potential for abuse, one arrives at a rather long list of drugs, some of which may rarely, if ever, be abused in practice, although one can conceive that such agents could possibly satisfy the needs of an individual who is dependent upon barbiturates or amphetamines. For example, paraldehyde is occasionally used by desperate alcoholics in lieu of alcohol and could be similarly used by a barbiturate addict. However, its unpleasant odor and taste would probably make it an unlikely choice of such an individual and its liquid form might make it unsuitable for dispensing on a blackmarket basis. Some of the other compounds which could be listed, for example hydroxyphenamate (Listica), are relatively little used in medicine generally. Someone inclined to abuse sedatives might not have heard of such a drug and thus not be likely to seek it out. On the other hand, it is possible that individuals now abusing barbiturates which they are obtaining illegally might turn to over-the-counter preparations such as Sominex if their illicit supplies of barbiturates are cut off. If the broad range of sedative prescription drugs are to be brought under control, perhaps consideration should be given to the status of the over-the-counter preparations with sedative properties which may be as likely candidates for use in lieu of barbiturates as are nonbarbiturate sedatives available only on prescription.
 In addition, the whole question of the availability of bromides on an over-the-counter basis could be re-evaluated, since these agents can be used by individuals who wish to feel sedated and prolonged use can produce a bromide psychosis.
 In developing our list of sedative compounds we have included all those which have been shown by Dr. Gerald Deneau in the Department of Pharmacology at the University of Michigan to effectively replace barbiturates and prevent withdrawal symptoms in dogs made physiologically dependent upon barbiturates. Two drugs meprobamate and glutethimide, have also been shown to produce barbituratelike addiction in dogs.
 In considering amphetamine-like drugs, we have concluded those with amphetamine-like effects in man in which there have been reported cases of psychic dependence and abuse.
 Several of the sedative-tranquilizer drugs have also been reported to cause either physiological abstinence syndromes or to be abused for their sedative properties. A detailed list of bibliographic references relating to abuse, dependence and abstinence syndromes or, in the case of the stimulants, drug-induced psychoses, is being prepared by the National Clearinghouse for Mental Health Information and will be transmitted next week.
 It should be noted that the major tranquilizers useful in the treatment of schizophrenia, principally the phenothiazine derivatives and the rauwolfia alkaloids, are not included in the listing because these agents are generally found unpleasant by drug-abuse-prone individuals and are not, to my knowledge, subject to abuse.
 I have not specifically addressed myself to the preparations which could be considered exempt because they include both drugs with a potential for abuse and other drugs which would be likely to make the abuse of the combination preparation unlikely. However, if Commissioner Larrick would be willing to provide me with a listing of the multitudinous preparations of this type and their constituents, I could attempt to provide opinions concerning the potential for abuse of these specific preparations.
 In addition to the barbiturates, the following sedative drugs should certainly be under control since they not only can prevent barbiturate withdrawal symptoms but also have been reported to cause physical dependence in man; meprobamate (Miltown, Equanil, Meprospan, Meprotabs); glutethimide (Doriden); ethinamate (Valmid); ethchlorvynol (Placidyl); methyprylon (Noludar), and chlordiazepoxide (Librium).
 In addition the following drugs have been shown to substitute for barbiturates in barbiturate-dependent animals and should probably be under control: chloral hydrate, paraldehyde, carisoprodol (Soma) and bromural.
 The following compounds are sedative but have not been tested in dogs: diazepam (Valium); hydroxyphenamate (Listica); hydroxyzine (Atarax, Vistaril); phenaglycodol (Ultran).
 In my opinion they might also be shown to suppress the barbiturate abstinence syndrome since bromides are the only nonphenothiazine sedatives tested, to date, which have failed to suppress this syndrome.
 Abuse of the following stimulants in an amphetamine-like manner has been reported, either in England or the United States: methylphenidate-HCl (Ritalin) and phenmetrazine-HCl (Preludin).
 The following compounds have amphetamine-like actions and might possibly be abused; pipradol-HCl (Meratrain) and diethylpropion-HCl (Tenuate).
 All non-phenothiazine and non-rauwolfia sedatives or tranquilizers could be considered for inclusion as could all stimulants and anorexegenic agents.
 Direct evidence of abuse or dependence in man would be a more restrictive and possibly cleaner basis for making decisions about the inclusion of drugs under control. By this criterion, meprobamate, glutethimide, ethinamate, ethchlorvynol, methyprylon, chlordiazepoxide, methylphenidate and phenmetrazine should be under control while other sedatives and stimulants should be watched for evidence of abuse.
 I have not included any of the hallucinogenic drugs in that list (such as LSD [lysergic acid diethylamide] or psilocybin) since they are investigational new drugs (IND) and therefore are not available on prescription.
 I hope the above information is of assistance to Commissioner Larrick and will be helpful to you in preparing your reply.
 /s/ STANLEY F. YOLLES
 Stanley F. Yolles, M.D.
 
 
 [32]
 See Final Memorandum of Hoffmann, pp. 20-23
 
 
 [33]
 21 U.S.C. Sec. 371(f)(3) (1971)